Eric Boyd HOLDEN *v.* STATE of Arkansas

CR 86-52 721 S.W.2d 614

Supreme Court of Arkansas
Opinion delivered December 15, 1986

460

*Lee A. Biggs, III*, for appellant.

*Steve Clark*, Att'y Gen., by: *Robert A. Ginnaven, III*, Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. Eric Holden was convicted of first degree murder and sentenced to 35 years imprisonment. He raises four arguments for reversal. First, a mistrial should have been granted when the prosecuting attorney mentioned, in his opening statement, that Holden asked for a lawyer; second, a statement Holden made to an officer after interrogation had ceased should have been excluded; third, a rifle, some ammunition and other items seized in his bedroom at the time of his arrest should have been excluded as evidence; and fourth, there was insufficient evidence to support his conviction. We find no error

and affirm the conviction.

There was no direct evidence that Holden shot and killed Penelope Turnbull on December 1, 1984, but there was strong circumstantial evidence that he fired the shot. The murder occurred during a party at the residence of Lisa and Jackie McChristian in Joy, White County, Arkansas. Turnbull was killed by someone firing a weapon from outside the house. Holden signed a statement for officers after he was arrested, but the trial court excluded it because Holden asked to talk to a lawyer and the officer continued to interrogate him. Holden did not admit firing a weapon in the statement. Holden had also been drinking and smoking marijuana that night. However, after Holden said he wanted a lawyer, he asked the officer two questions, which were held admissible by the court.

Sergeant J. R. Howard of the Arkansas State Police testified that after he warned Holden of his rights, Holden said he wanted a lawyer. Howard said he ceased the interrogation and was preparing to leave when Holden asked him: "What's going on? Why am I here?" Howard replied that "a person has been shot out at Joy and you are a suspect in it." Holden then said: "What's her name?" This is the conversation the trial judge ruled admissible, finding it was a conversation initiated by the defendant after the officer had ceased questioning and was not an involuntary statement induced by the officer. Officer Howard continued the conversation and began interrogating the defendant. The written statement which resulted was excluded.

The first and second issues focus on this conversation that the trial court ruled admissible. First, the deputy prosecuting attorney mentioned the conversation in his opening statement. He said:

> The defendant is arrested and he is read his Miranda rights, and during the course of those rights as they are read to him he states, I want a lawyer. So Officer Howard of the Arkansas State Police folds his papers up, and he says all right, there will be no more questions. Officer Howard stopped asking questions.

The defense immediately moved for a mistrial because the attention of the jury was focused on Holden's invocation of his

constitutional right to a lawyer. It was argued that this could lead the jury to believe the defendant was trying to hide something. The specific legal argument on appeal is that it was a comment on the defendant's right to remain silent which can be prejudicial error. *Doyle* v. *Ohio*, 426 U.S. 610 (1976). The state argued that since the trial court had ruled the questions Holden asked admissible, the state was merely explaining to the jury what happened leading up to the conversation; otherwise, it might appear that the officer did not warn Holden of his rights, a duty of which most people are aware. The trial court considered whether telling the jury the defendant exercised his constitutional right to a lawyer might influence the jury and create a circumstance in deciding Holden's guilt or innocence. The judge denied the mistrial motion but offered instead to give a proper cautionary instruction that the jury must not consider the fact that Holden asked for a lawyer in its consideration of guilt or innocence. The defense declined the offer and stood on its mistrial motion.

The legal issue to us is whether this was a comment on the right of a defendant to remain silent or whether it was a prejudicial comment requiring a mistrial. The leading decision on this issue is *Doyle* v. *Ohio, supra*. There, the prosecutor repeatedly asked the defendant during cross-examination why he remained silent when questioned by the authorities. The court held that the *Miranda* warning carries an implicit guarantee that an arrested person's silence will not be used to impeach an explanation later offered at trial.

The situation here is not exactly the same as in *Doyle*. There was no direct reference by the state to the defendant's silence or emphasis that the defendant refused to make a statement, which is the error addressed in *Doyle*. The state simply mentioned what was said immediately before Holden asked two questions which were admitted. One court has held that the test to be applied to such comments is whether the reference is intended or calculated to direct the jury's attention to the defendant's silence. *People* v. *Morgan*, 112 Ill.2d 111, 492 N.E.2d 1303 (1986). Here, it was not cross-examination emphasizing Holden's silence to the jury. While Holden's exercise of his constitutional right to a lawyer was mentioned, it was not a calculated reference to Holden's silence. The appellant has cited no case holding such a statement is of such a prejudicial nature that it will prevent a fair trial.

The trial court offered to cure any possible prejudice with a curative instruction. Holden argues on appeal that an instruction could have cured the prejudice, citing *Lakeside* v. *Oregon*, 435 U.S. 333 (1978). The appellant argues that the defense took no position on the instruction, and it was the court's duty to give the instruction on its own. This is what counsel said: ". . . for the record we renew our motion for a mistrial. We object to the proffer [the instruction the court offered to give]." The court replied that the instruction was offered for the benefit of the defense, and if the defense objected to the instruction, it would not be given.

Appellant's attorney stated that he would prefer that the court grant a mistrial, he would take no position on the instruction and he was not waiving his right to a mistrial. He stated that the proffered instruction *would not* cure the error. Now the appellant argues that it could have cured the error and should have been given.

The defense had its choice and refused the offer. The defense wanted a mistrial and made it clear it would not be satisfied with the instruction offered. In *Carter* v. *Kentucky*, 450 U.S. 288 (1981), the United States Supreme Court said:

> A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and he has an affirmative constitutional obligation to use that tool *when a defendant seeks its employment.* No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, *but a judge can, and must, if requested to do so,* use the unique power of the jury instruction to reduce that speculation to a minimum (Italics supplied.)

See also *James* v. *Kentucky*, 466 U.S. 341 (1984).

First, we cannot say the court here committed error in refusing to grant a mistrial. Next, we hold the trial court was not required to give the instruction unless requested to do so by the defendant.

After the trial court's ruling, the opening argument continued, and the state's attorney picked up where he left off, reciting Holden's responses and Holden's remark "What's her name?"

No mention was made during the trial about the silence of the defendant, or the fact that he had asked for a lawyer.

The second issue is closely related to the first. It is that the statements ruled admissible were not voluntary because they were made after Holden said he wanted a lawyer and the result of interrogation by the officer. Officer Howard testified that he deliberately used the word "person" rather than the victim's name when he said "a person was shot out at Joy . . ." The officer's motive in framing his statement is irrelevant. The question is did he interrogate Holden. The appellant argues that the officer tricked Holden into saying "What's her name?" and in effect interrogated Holden when the interrogation should have ceased.

■■ The fundamental rule of applicable law was announced in *Edwards* v. *Arizona*, 451 U.S. 477 (1981); that is, once a defendant indicates he wants a lawyer, the interrogation must cease. That is a principle we have followed without exception. *Futch* v. *State*, 288 Ark. 323, 705 S.W.2d 11 (1986); *Dillard* v. *State*, 275 Ark. 320, 629 S.W.2d 291 (1982); *State* v. *Branam*, 275 Ark. 16, 627 S.W.2d 8 (1982). However, if a defendant or suspect initiates further conversation on his own or makes a voluntary statement, it will not be excluded as involuntary. Such a conversation cannot be the functional equivalent of interrogation. But "any statement given freely and voluntarily without any compelling influence is, of course, admissible as evidence." *Rhode Island* v. *Innis*, 446 U.S. 291 (1980).

Was the conversation an "interrogation" by the officer? In *Edwards* the defendant said he wanted a lawyer and the questioning ceased. The next day the police told the defendant he had to talk and a confession was obtained. In *Oregon* v. *Bradshaw*, 462 U.S. 1039 (1983), the defendant, having exercised his right to remain silent, later started a conversation with an officer by saying "Well, what is going to happen to me now?" That led to further conversation which ultimately resulted in a confession. Due to the lengthy "conversation," the case was remanded to determine if the statement obtained was indeed voluntary.

■ We find none of these limiting factors present here. Holden asked for it. The officer was honoring his request for a lawyer, Holden asked why he was there, he was told, and he said

"What's her name?" It was a voluntary statement by him. No attempt was made to interrogate him or compel him to say anything. He volunteered both questions—they were not answers. The trial court ruled these statements admissible and was correct.

The third issue is the seizure of the gun, ammunition and other items in Holden's bedroom. The arrest of Holden in his home without a warrant is not questioned. The police had probable cause. What happened that night is found mainly in the lengthy testimony of two Arkansas State policemen, Officer Larry Mitchell and Sergeant J. R. Howard. Both received radio calls late on December 1 to go to the McChristian residence in Joy where there had been a shooting. The officers were told that Eric Holden had shot someone. Several other officers were also present. Some approached the McChristian residence from the back door, some by the front. A storm door had to be broken to gain admittance. The victim was found lying on the floor. They heard people "screaming and hollering" and found several people in a bedroom, trying to get under the bed or hide saying that Eric Holden had shot her and was outside somewhere. According to Mitchell, the people were hysterical. Mitchell tried to find out from these people Holden's whereabouts. He learned that Holden lived two doors away. It was dark outside. Not finding Holden, the officers approached Holden's house, beat on the front door and called out. Getting no response, the decision was made to enter the residence. This is part of Mitchell's testimony according to the appellant's abstract:

> This was minutes after I had left the first residence and I proceeded into the Holden residence, armed with my service revolver and my 12 gauge shotgun. Sergeant Howard was armed, I believe, with a 357 magnum Model 66, Smith and Wesson, and an AR-15. We proceeded into the house, to look for Eric Holden. Sergeant Howard, myself and Officer Denney entered. We continually announced ourselves as Arkansas State Police, and White County Deputy Sheriffs. We got no response. Then, as we were moving down the hall, through the kitchen, a voice came from this side room, 'What's going on out there.' I identified myself as an Arkansas State Policeman, and told this person to come out. There was a racket that sounded to

me like a bolt opening and closing on a weapon. The racket came from the room where the person's voice came from. Then there was a movement, a screech, a sound, and then there was a large thump, a loud sound, and I saw a portion of a right hand. I repeated myself, telling him 'Eric, come out,' calling him by his first name, 'come out where I can see you.'

He asked me if he could turn on the lights. I told him to turn the lights on. He reached across to turn the light on, and I told him to stay right there, don't go back in. I was pointing a weapon at him, a 12 gauge shotgun. He stopped. He kept asking, 'What's going on.' I told him, bring yourself out to where I can see you.

I was continually talking to Eric Holden, and telling him to come out. He wouldn't move past the facing of the door, and I couldn't see his left hand, and all of a sudden he started to take a step back. I jumped forward and grabbed him by the front of the collar of his shirt, and brought him up in the room and placed him up against the wall. I did not seize any items of physical evidence.

* * * *

Our intention in going into the house was to search for Eric Holden. We went into the house and hollered. We went through the kitchen, and down a short hall. I testified that when he turned his light on, I could see a portion of his body. He was probably standing three feet to the rear of the facing of the door when he reached over and flipped the light on. Then he made a motion, and I reached in and grabbed him, and I said, 'don't go back in,' meaning, don't go back in the bedroom. At no time prior to the arrest did I go into the bedroom.

When I reached in for him, I'm sure half of my body was in the bedroom at this point. I brought him out, put him up on the wall, and, of course, I suppose at that point I was forced into the bedroom by the other officers. I had a shotgun in one hand, and him in the other. I put him up against the wall. I suppose I was all the way in the bedroom at that point. I put him up against the wall in the hall.

There were two or three other officers in the hall.

He was handcuffed and taken into the kitchen, which was probably three or four feet. There was a utility hall, a washer and drier, his uncle was there in the kitchen. I believe they stood there and talked for a while. *He was fighting the putting of handcuffs on, but we got them on him. You are always concerned he was going to have a gun or shoot you, even with handcuffs on.* (Italics supplied.)

* * * *

At this point we had not discovered any evidence or any of the items. He was arrested and put into handcuffs and removed to the kitchen. I did not see a search warrant. The rifle came out of the bedroom that he was arrested in. It was under the bed or against the wall. Part of the evidence was visible, I believe the shells were visible.

* * * *

I went into the house with a 12 gauge shotgun after Eric Holden, instead of calling up a Judge to get a Search Warrant, because from the information that I had received from the moment the call came in, we had a woman dead, the person that did the shooting was Eric Holden, he was either outside the murder house or was in his house. I was scared. I heard the action of a rifle being opened. When I arrested him I jerked him out of the bedroom. J. R. Howard was at my back, low on the ground, and I believe Bill Denney was in the house. I don't believe there was anybody else. I believe the uncle, along with Captain Short, was on the back porch. This is at the incident of arrest, when I jerked him out of the bedroom, the uncle and Captain Short, the uncle moved to the kitchen and Captain Short moved to assist in the cuffing of the subject. One of the officers, apparently J. R. Howard, secured the evidence at that time of that lawful arrest.

* * * *

I was scared that he might reach for a gun and do me bodily harm, which is a normal reaction. I don't want to sound blase, I am employed by the State of Arkansas, to

protect the people of the State of Arkansas. From the information I received, he shot the girl, he still had possession of the firearm, Eric Holden had to be taken where he couldn't hurt anybody else. That was the whole reason for the whole thing.

* * * *

I don't know if he was armed or not when I grabbed him and put him up against the wall because I couldn't see his left hand. We did not frisk him when we had him up against the wall. We did not find any firearms on him. I didn't personally look for firearms on his person.

Sergeant J. R. Howard was behind Mitchell and immediately entered the bedroom at the same time Mitchell handcuffed Holden. He saw the knife, some ammunition and found the rifle under the bed. His testimony was:

We didn't go get a Search Warrant before we went in there because a woman had just been killed, and we didn't feel like we had time. We entered the house because we felt like that was his residence, and a high probability that he was there.

We felt like it was necessary for everyone's safety involved to check to make sure if he was or wasn't in the house. I was not with Mitchell at the scene before going there. They had already left the first residence and were at the Holden residence when I got there.

I was going down the hall with Trooper Mitchell in the Holden residence. For a long time we didn't observe anything. We were calling out, trying to raise someone, in a loud voice.

We were calling Eric by his first name, and to come out, but there was no response, and we were in the house. We identified ourselves as being with the State Police, and also Officer Denney was there with the Sheriff's Office. He identified himself as being with the White County Sheriff's Department, as I recall. *But at some point we heard some noise in the bedroom*, which was the suspect's bedroom, and we heard him call out, and told him to come out with

his hands up, him being Eric Holden. [Italics supplied.]

I believe Trooper Mitchell first laid hands on the defendant, Eric Holden. The Defendant had come out of the bedroom, and there was, I guess you call it a short hallway, and he was in that hallway.

I guess you would say Mitchell was at the kitchen end of the hall, as opposed to the bedroom.

Mitchell did not get to the bedroom end until after the suspect was in custody. We called him. He finally turned a light on. Mitchell was standing up, leaning, and looking down the hallway, and I was crouched down beside the bar in the kitchen, looking around Mitchell, but he actually placed him under arrest.

I then went in the bedroom. *Before he was arrested I heard something in the bedroom. I heard some noises, I couldn't identify them per se, except the last noise I heard was just a kind of thump right beside the door, and after the suspect was in custody, I went in the bedroom and there was a hunting knife lying—*

*Prior to going into the room I did not know for a fact whether or not anyone else was in there. I went in the bedroom and had occasion to see certain items in the bedroom. The first thing I observed was some high-powered rifle shells laying on the floor by the bed, and I just took note of that. I also observed a little red plastic case lying on the floor, a cartridge carrier that had some high-powered rifle shells in that. That was one of the first things I noticed, and a closer inspection showed there was a rifle under the bed. I seized the rifle.* (Italics supplied.)

\* \* \* \*

*I shined a light under the bed and saw it. I seized the rifle, there was a live .243 round partially in the chamber, kind of laying in the chamber.* It wasn't completely chambered. The bolt on the rifle was opened, and the cartridge was more or less laying in the area of the chamber, and so I seized that cartridge, I seized the rifle, I believe two other live rounds lying on the floor, one near the

rifle was under the bed, another was on the floor. Those are unexpended cartridges that fit the rifle I am holding. I seized other items. There was a brown plastic gun case under the bed that I seized and also an Old Timer hunting knife which I found lying beside the door as you go in the bedroom. The suspect was wearing a scabbard but the knife wasn't in one.

All I seized was the shells and the gun. The gun was a Remington Model 700, .243. The gun had a scope on it. *I took custody of them right there immediately, at the same time he was being taken into custody.* (Italics supplied.)

\* \* \* \*

I went right into the bedroom the Defendant, Eric Holden, came out of right after that. *I didn't know if anybody else was in there or not.* (Italics supplied.)

\* \* \* \*

Anytime I go in the house to get a homicide suspect, I try to cover myself every way I can, and one way you do it is to make sure you get everybody in the house, and that's why I went in there and looked.

I went to the door and didn't see anybody. *The bed was large enough that somebody could have been hiding under it. It was a full size bed, and I don't recall how low it was.* (Italics supplied.)

The trial court ruled the seizure was legal because the officers thought it was necessary to eliminate or minimize danger to themselves and others. The judge remarked on the fact that there was a reasonable possibility that someone was under the bed and that is one reason Howard looked there.

■ A search for or seizure of evidence in a defendant's home without a search warrant and incidental to a legal arrest is generally governed by *Chimel v. California*, 395 U.S. 752 (1969), and *Shipley v. California*, 395 U.S. 818 (1969). In *Chimel* the defendant was arrested in his home, and a search of the entire home was made, including the attic, garage and workshop. The court addressed the question in broad language:

. . . When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. . . .

\* \* \* \*

'The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest.'

In *Shipley* the defendant was arrested outside his home and his home was searched. It was deemed unreasonable.

■ We must also consider the "plain view" doctrine which

can be applied when four circumstances exist: (1) the policeman seizing the evidence is in a place where it is lawful to be when he sights the evidence, (2) the discovery is inadvertent, (3) the items seized must be incriminating at a glance, and (4) they must be plainly visible.

■ In *Mincey* v. *Arizona*, 437 U.S. 385 (1978), the United States Supreme Court said this about such seizures:

> . . . when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' . . And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.

In *Mincey* the search was deemed unreasonable because all persons in the apartment had been located and a four day thorough search was conducted.

■ Was the trial court right? Was this seizure justified because some articles were in plain view? Was the look under the bed justified to insure the safety of the officers? Was the seizure justified? We think it was. First, we must view the facts on appeal most favorably to the appellee. *Dix* v. *State*, 290 Ark. 28, 715 S.W.2d 879 (1986). Next we only overrule a trial court's decision if it is clearly wrong. *Hicks* v. *State*, 289 Ark. 83, 709 S.W.2d 87 (1986).

The officers here were apprehensive and not fully aware of what awaited them in the darkened house and acted quickly once they grabbed Holden. Whether Holden was two or three feet from the bedroom at the time Officer Howard searched the room should not decide the matter. What counts is whether the officers were justified in making certain no one else was in the room and no one could possibly get to a weapon.

■ Officer Mitchell testified he had trouble handcuffing Holden. Howard's action, simultaneous with Mitchell's, was perfectly natural and reasonable—the room had to be checked for weapons and people. The gun was not in the closet nor was it hidden from view. All Howard had to do was look under the bed,

which he did. The fact that the gun was under the bed would not mean it was not in plain view. In the case of *Texas* v. *Brown*, 460 U.S. 730 (1983), an officer shined a flashlight into a vehicle and spotted contraband. The court held the evidence in plain view. The court said: ". . . use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." Furthermore, the fact that the officer had to "change [his] position and bend down at an angle so [he] could see what was inside" the car is irrelevant to Fourth Amendment analysis. The court held the question of whether the plain view doctrine applied turned on the legality of the intrusion that enabled the officer to see and seize the property. In this case that would mean, did Howard have a legal right to be in the room? A strict, indeed an unreasonable, application of *Chimel* might reach another result. But it would indeed be unreasonable. These situations are never the same, and all factors must be considered in arriving at a decision of whether the search is reasonable.

 The Fourth Amendment protects property from seizure and the right to privacy from intrusion. If the right to be at a place exists, a seizure is deemed reasonably justified under the circumstances. In *Bell* v. *Wolfish*, 441 U.S. 520 (1979), the court said:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

In the recent case of *New York* v. *Class*, ___ U.S. ___, 106 S. Ct. 960 (1986), the court had this to say about such searches and seizures:

> . . .When a search or seizure has as its immediate object a search for a weapon, however, we have struck the balance to allow the weighty interest in the safety of police officers to justify warrantless searches based only on a reasonable suspicion of criminal activity. (Cites omitted). Such

searches are permissible despite their substantial intrusiveness.

Three factors were considered in *Class* in upholding the search: "[T]he safety of the officers was served by the governmental intrusion; the intrusion was minimal; and the search stemmed from some probable cause focusing suspicion on the individual affected by the search." All three factors are involved in this case.

The appellant contends the case of *Moore v. State*, 261 Ark. 274 (rehearing granted p. 278), 551 S.W.2d 185 (1977), is directly on point and requires us to reverse the judge's ruling. In *Moore* there was no question of security or safety involved.

The trial court was justified in upholding the search as necessary to insure the safety of the officers.

Finally, we consider the sufficiency of the evidence. The party started about 1 p.m. at the McChristian house on the afternoon of December 1, 1984. Alcohol and marijuana were being used liberally. Holden, who was drinking and smoking marijuana, had words with the hostess and made threatening remarks to others present. The victim, who had not met Holden before, flipped Holden's hat off. He slapped her. She cried and slapped him back. This evidently caused a confrontation. Holden remarked to the two Pratt brothers, Tommy and Anthony, that he would take on both of them. He challenged to fight everyone present. He was asked to leave. Anthony Pratt said Holden said "he would kill us." According to Tommy Pratt, Holden said he would come back and kill them.

Holden left through the back door, and ten or 15 minutes later a shot was fired from outside. Then another shot was heard. Both shots came from the back of the house. The Pratt brothers said they saw the fire from the weapon. Penny Turnbull, who was in the kitchen, was killed. A few minutes later Holden came to the back door, apparently entered the house, and said "Wow man, what happened here, man?" None saw him because they were in the bedroom hiding. But they recognized his voice. Holden left as the officers approached in their vehicles.

There is the physical evidence which was scattered over the floor of the bedroom, a knife, shells, and shell holder. A high-powered rifle, recently fired, with a cartridge partially in the

chamber, was lying under the bed out of its case. There is the question by Holden, "What's her name?" He had not met Penny Turnbull before. The only conclusion one could reach is there was substantial evidence that Holden murdered Penny Turnbull, and he had a fair trial.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. I disagree with the manner in which the majority opinion addresses the issues concerning the state's opening statement and the warrantless search of appellant's residence. The first part of this dissent is based upon the law and the facts as set out in the majority opinion. Based on my understanding of the law and precedent, I am compelled to reach a different conclusion.

During the opening statement the prosecutor made the following remarks:

> The defendant is arrested and he is read his Miranda rights, and during the course of those rights as they are read to him, he states, I want a lawyer. So Officer Howard of the Arkansas State Police folds his papers up, and he says all right, there will be no more questions. Officer Howard stopped asking questions.

The court denied the appellant's motion for a mistrial but offered to give a limiting instruction. Defense counsel rejected this offer. In my opinion the instruction would have simply called to the jury's attention a second time the appellant's invocation of this constitutional right. The jury could just about as easily have forgotten this statement as it could have forgotten having heard a shotgun fired during the opening statement.

The majority attempts to distinguish *Doyle* v. *Ohio*, 426 U.S. 610 (1976), with the statement that "[t]he situation here is not exactly the same as in *Doyle*." The distinction is nothing but an effort to evade the clear holding in *Doyle*. No price should be required of any person for invoking a constitutional right. The practical effect of these remarks in the opening statement was to shift the burden to the appellant to explain why he had invoked his constitutional right to an attorney. I will assume that the state's

opening statement accurately described the incident for the purposes of this opinion.

We have spoken on the issue of the defendant's right to remain silent many times and up until now we have held that the right to remain silent can not be used against an accused. In *Clark v. State*, 256 Ark. 658, 509 S.W.2d 812 (1974) we stated:

> We are, of course, controlled by the federal requirements of the Fifth Amendment as well as our own similar constitutional and statutory provisions. Part of the requirements of the federal amendments demand that the prosecution not comment on the defendant's failure to testify.

The *Clark* case was before us because the prosecuting attorney, in his opening statement, called the jury's attention to the situation that the victim of the homicide (husband of the accused) could not be there to tell his story. The prosecutor then said to the jury, "The story then that you will have about what happened out there will come from her." The trial court denied a motion for a mistrial. On appeal we reversed because the prosecutor's opening statement was improper.

The exact same series of events as were before us in *Clark* are before us in the present case. In *Clark* at 661, we stated: "We have held that it is error, over defendant's objection, to give an instruction that defendant's failure to testify is not to be considered by the jury. [Citations omitted.] Even such a neutral comment on defendant's silence should not be given over his objection." The comment by the prosecutor in this case was improper and such comments should not have been permitted.

After the appellant had invoked his constitutional right to an attorney, the efforts of the police to interrogate him continued. In fact a written statement was thereafter obtained from the appellant, which statement was excluded by the trial court in the presence of the jury. No reference to a signed statement should have been made in the presence of the jury. The reference likely left the jury with the impression that it was a confession.

In *Rhode Island* v. *Innis*, 446 U.S. 291 (1980), the United States Supreme Court discussed psychological ploys calculated to initiate "voluntary" statements. The Court held that a person who has invoked his right to counsel could not be subjected to

express questioning or its "functional equivalent." The *Innis* opinion stated that the term "interrogation" under *Miranda* applies to words or actions on the part of the police that they should know are reasonably likely to elicit an incriminating response from the suspect. *Supra* at 299.

To compound the error, in the opening statement the prosecutor recited Holden's remark, "What's her name?" Officer Howard later testified that he deliberately used the word "person" rather than the victim's name when he said, "a person was shot out at Joy." I am in total disagreement with the statement in the majority opinion, "The officer's motive in framing his statement is irrelevant." I disagree. Motive in this case is very important. This statement by Officer Howard is clearly the "functional equivalent" of continuing interrogation.

I agree with the majority opinion that the fundamental rule of law enunciated in *Edwards* v. *Arizona*, 451 U.S. 477 (1981) is that once a defendant indicates he wants a lawyer, the interrogation must cease. I also agree with the majority opinion that in the past we have followed the rule without exception. One of these opinions is *Futch* v. *State*, 288 Ark. 323, 705 S.W.2d 11 (1986). In the present opinion the majority has departed from the *Edwards* rule.

Next, I want to discuss the matter of the warrantless search. It is very important that we know the location and the circumstances of the appellant at the time of his arrest if this search and seizure is to be justified as a search incident to an arrest. Below is some of the testimony of the officers which is included in the majority opinion.

From the testimony of Officer Mitchell:

> "I proceeded into the Holden residence armed with my service revolver and my 12 gauge shotgun . . . Sgt. Howard, myself and Officer Denney entered . . . Then, as we were moving down the hall, through the kitchen, a voice came from this side room, 'What's going on out there?' " . . . He was probably standing three feet to the rear of the facing of the door when he reached over and flipped the lights on . . . . At no time prior to the arrest did I go into the bedroom . . . . I put him up against the wall in the

hall. There were 2 or 3 other officers in the hall. He was handcuffed and taken into the kitchen which was probably 3 or 4 feet . . . . At this point we had not discovered any evidence or any of the items. He was arrested and put into handcuffs and removed to the kitchen. I did not see a search warrant. The rifle came out of the bedroom that he was arrested in. It was under the bed up against the wall. Part of the evidence was visible, I believe the shells were visible . . . .

From the testimony of Officer Howard:

"The defendant had come out of the bedroom and there was, I guess you call it a short hallway and he was in that hallway. I guess you could say Mitchell was at the kitchen end of the hallway, as opposed to the bedroom. Mitchell did not get to the bedroom end until after the suspect was in custody. Mitchell was standing up, leaning, and looking down the hall and I was crouched down beside the bar in the kitchen, looking around. Mitchell, he actually placed him under arrest. . . . [A]nd after the suspect was in custody, I then went in the bedroom and there was a hunting knife lying . . . and a closer inspection showed there was a rifle under the bed. . . . I shined a light under the bed and saw it . . . the bolt on the rifle was open . . . ."

Although not recited in the majority opinion, Officer Mitchell also testified:

[T]hen as we were moving down the hall through the kitchen, . . . I repeated myself, telling him, Eric, to come out, calling him by first name, come out so I can see you. He asked if he could turn on the light, I told him to turn the light on. He reached across to turn the light on. I could see half of his body, and he flipped the light on, and I told him to stay right there, don't go back in. . . . "He had come out of his bedroom and there was, I guess you call it a short hallway and he was in that hallway. I guess you could say the kitchen end of the hallway as opposed to the bedroom."

The overall testimony of the officers and the diagram in the record which was prepared by them, clearly show that the appellant was in the hallway at the time he was arrested. Officer

Howard, who was following Officer Mitchell down the hallway, stated that the actual arrest took place 6 to 8 feet outside the bedroom door. In any event there is no evidence that the appellant was within the "lunge area" of the seized evidence. At the time of the search the appellant was under arrest, handcuffed, under guard by several heavily armed officers, and probably even out of the residence. A few questions and answers bearing heavily upon this decision are set out as follows:

Q: So from the time that he was arrested until the time that you walked the 6 or 8 feet to the door, there was a possibility that there might be somebody else there?

A: Yes, sir.

Q: And then when you made the determination there was not anybody else there, those exigent circumstances were gone, is that correct?

A: Yes.

Q: You weren't afraid somebody would jump out and shoot you?

A: That is correct.

---

Q: [W]as there any reason why you could not have gotten a search warrant to search that bedroom, later in time?

A: Probably not . . .

Q: So you weren't afraid somebody was going to remove the evidence?

A: No.

Q: You were not afraid the evidence was likely to be removed or destroyed before you could get a search warrant?

A: We could have posted someone there to secure the scene.

Q: I believe the rifle was not in plain sight?

A: That is correct.

Q: It was under the bed?

A: Yes.

Q: And you had to get a light down and search and you retrieved it, is that correct?

A: That is correct.

The above is but a sample of the circumstances at the time of the search. There was clearly no danger of harm to the officers or of destruction of evidence at the time of the search and no exigent circumstances existed.

In *Chimel* v. *California*, 395 U.S. 752 (1969), it is stated:

[I]t is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. . . . And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. . . . *There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'* — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. [Emphasis added.]

*Supra* at 763. *Chimel* goes on to hold that there is no justification for "routinely searching any room other than that in which an arrest occurs" or for searching desk drawers or other closed or concealed areas in the same room.

In *Moore* v. *State*, 261 Ark. 274, 551 S.W.2d 185 (1977), we considered a similar factual situation where the appellant was arrested in one room and the arresting officers proceeded to search in other areas of the house after the appellant was removed. There the officers found a gun and other items. In reversing and remanding on rehearing we cited *Chimel* v. *California*, *supra* and stated:

The officers did not have a search warrant or legal consent to search the premises. The law permits a search of the area within the immediate control of the person arrested. . . . However, a search of the rest of the house turned up a .32

pistol. We hold that only those items in Moore's bedroom were lawfully seized and all other evidence was improperly seized.

It is clear from the facts in the present appeal that there was no evidence of weapons on the person of the appellant. There were no exigent circumstances. Therefore, the seizure of the rifle and other items were not necessary for the protection of the officers or the prevention of the destruction of evidence. I would hold that the items seized in the bedroom without a search warrant, after the suspect was in custody, were unlawfully seized and therefore inadmissible.