2013 Ark. 100

**Marlin Dval STEVENSON, Appellant**

v.

**STATE of Arkansas, Appellee.**

No. CR 12–697.

Supreme Court of Arkansas.

March 7, 2013.

M. Brian Miles, for appellant.

Dustin McDaniel, Att'y Gen., by: Kent G. Holt, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice.

Marlin Dval Stevenson appeals a conviction for first-degree murder and sentence of life imprisonment. On appeal, he alleges that the circuit court (1) erred in denying his directed-verdict motion, (2) erred in denying his motion to suppress his statement, (3) abused its discretion in denying his motion for mistrial when the State disclosed Stevenson had invoked his right to counsel, (4) abused its discretion in denying his motions to exclude prior bad acts, and (5) abused its discretion in failing to exclude the plaster cast of the knife impression taken from a knife box. We find no error and affirm the conviction of first-degree murder and sentence of life imprisonment. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2)(2012).

On the evening of August 17, 2011, Michael Fox was stabbed, and he died soon afterward. According to the testimony of Deputy Medical Examiner Dr. Steven Erickson, Fox suffered three stab wounds, one above the collarbone that cut his external jugular vein, one that severed his brachial artery on his arm, and one to the back of his chest wall that cut through the left side of one lung. Dr. Erickson testified that the primary cause of death was blood loss and a collapsed lung.

The following facts were adduced from the testimony at trial. On August 17, 2011, Stevenson was living with Fox and Fox's mother, Christina Atchley. Two of Atchley's grandchildren lived in the home as well. When Stevenson left the home that evening, Fox told Atchley that Stevenson had been smoking "weed" in the home while she was at work. When Stevenson returned to the home, Atchley spoke with Stevenson regarding Fox's concerns. After their conversation, Stevenson went outside and stated, "I'm gonna to show everybody I'm not a pussy anymore, I'm tired of this." He came back into the house and went briefly into the bedroom that he and Atchley shared before again going outside. Atchley thought he had gone into the bedroom to get cigarettes. She testified, "[I]t seems like a few seconds later [Fox] opens the door and says, 'Mom, I have been stabbed.'" Atchley testified that, after she put her grandchildren in a bedroom, she went outside and "all I could see—it was like a blur of [Stevenson] running towards the back of the house. And he didn't say anything or [sic] anything. He just took off." Atchley attempted to call 911, but she was too upset. Fox then called 911. Atchley testified that, a couple of months earlier, she had seen a knife that Stevenson kept in a box beneath the bed. However, she did not see Stevenson retrieve the knife box or knife that evening.

Paragould Police Officer Tim Erickson took Fox's 911 call. He testified that Fox reported that he had been stabbed, and when asked who stabbed him, he stated, "Marlin Stevenson." Mario Rios testified that on the night of August 17, 2011, Stevenson came to his house "out of breath" and "confused," stating that he needed to talk. According to Rios, Stevenson said "he was in a fight with Christina's son and stated that, 'I think I stuck him.'" Shane Pogue testified that he was living with Rios and was present in the home when Stevenson was there on August 17. Pogue testified that there was "a blood spot on the bottom" of Stevenson's grey shirt and that Stevenson "told me he had been in an altercation and stabbed somebody . . . in the shoulder blade." Pogue testified that when Stevenson came out of the bedroom,

he had changed clothes. Rios testified that his fiancee washed Stevenson's clothes. Pogue went to the police department where he spoke with Paragould Lieutenant Mike Addison.

Addison proceeded to Atchley's house. He stated that he found a knife box on the floor in the bedroom. The knife box had a form where the knife fit in the box. He further stated that he found the lid to the knife box in the bedroom. The knife used to stab Fox was never found.

Evidence taken from Stevenson and the crime scene was analyzed. Kevin Soatag, of the Arkansas State Crime Lab testified that blood was found on Stevenson's right shoe, a spot "the size of the end of your pinkie."

In a statement to Addison, Stevenson admitted that he and Fox had fought, but stated, "I didn't stick him. I didn't have no knife." Stevenson admitted that the knife box was in the dresser drawer but alleged that he had sold the knife two months earlier and kept the box to use as a "stash box." He denied opening the dresser drawer. Stevenson's statement also provided the following information:

ADDISON: Ok. Well, where'd you get the knife from?

STEVENSON: I don't even know, I, I don't remember nothin like that as far as stabbin him. I'm serious.

. . .

STEVENSON: . . . . I don't remember havin a knife in my hand. . . .

. . .

ADDISON: Or you didn't have a knife.

STEVENSON: I don't remember.

. . .

STEVENSON: . . . . I don't know if I picked up the knife or not. . . .

. . .

ADDISON: If it wadn't [sic] a knife, did you pick up some other kind of instrument a pair of scissors or anything like that?

STEVENSON: I don't know. . . .

. . .

STEVENSON: . . . . it might have been a piece of metal. . . .

. . .

STEVENSON: . . . . I don't remember pickin up nothing and stabbin him with it. . . .

. . .

Stevenson: . . . . if I stab him with so-mem [sic] I had to pick it up outside and I don't remember pickin up noth-in . . .

Stevenson: . . . I probably did stick him, but I don't remember.

. . .

STEVENSON: I didn't say I may, I told H–Town I might have.

. . .

STEVENSON: . . . . when I got to 412 I didn't have nothin in my hand and I, you know if I did I dropped it.

Stevenson's argument at trial was that someone other than him had stabbed and killed Fox. Stevenson moved for a directed verdict, stating as follows:

Your Honor, at the close of the State's evidence. The defense will ask the Court not to submit the case to the jury, and to find that viewing the evidence in the light most favorable to the State that there is no basis on which the jury could find that my client is guilty of First Degree Murder. They have not presented any eyewitness testimony. They have not presented any murder weapon. And aside from the fact that he died by circumstances that they cannot otherwise attribute, they have offered no proof that my client is responsi-

ble for the death. We would ask for a directed verdict.

■ On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Anderson v. State*, 2011 Ark. 461, at 3, 385 S.W.3d 214, 217. This court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.*, 385 S.W.3d at 218. Substantial evidence is evidence that is forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.*, 385 S.W.3d at 218. The evidence is viewed in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.*, 385 S.W.3d at 218.

■ A person commits first-degree murder if "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark.Code Ann. § 5–10–102(a)(2) (Repl.2006). "A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark.Code Ann. § 5–2–202 (Repl.2006).

The circuit court denied the motion based on Fox's statement to 911 that Stevenson had stabbed him and Pogue's testimony that Stevenson had told him that he (Stevenson) had stabbed someone. Atchley saw Stevenson fleeing the scene. Stevenson admitted to Rios that he had stabbed Atchley's son. Stevenson admitted to Pogue that he had stabbed someone. Blood was seen on Stevenson's shirt, and blood was found on his shoe. In his statement to Addison, Stevenson admitted that he might have stabbed Fox. There was evidence that Stevenson had kept a knife in his bedroom. He was seen going into the bedroom before the fight. A knife box and lid were found on the floor, implying that Stevenson went into the bedroom and

got his knife. Substantial evidence supports the verdict, and there was no error in denying the directed-verdict motion.

■ Stevenson next asserts that the circuit court erred in denying his motion to suppress his statement because he had invoked the right to an attorney. After his arrest, Stevenson was taken to an interrogation room where he asserted his right to an attorney, and the interrogation was terminated. Addison testified as follows regarding a declaratory statement he made while taking Stevenson to a cell after terminating the interview upon Stevenson's invocation of the right to counsel:

> As we were walking down the hall toward the holding cell, I made a statement that if you decide you ever want to talk to us, you would have to request that . . . He asked me a question . . . He would just have to fill out a written request and send it to us . . . He said he would rather just go ahead and get this over with and talk to me now. He didn't want to have to go through that aspect of writin' a letter.

Stevenson cites this court to *Edwards v. Arizona*, 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (1981), arguing that the circuit court should have suppressed his statement, because the statement was made after he had invoked his right to counsel. In that case, the United States Supreme Court stated as follows:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not sub-

ject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. 1880 (1981). The Court in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) also discussed interrogation in this context:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300–02, 100 S.Ct. 1682 (emphasis in original) (footnotes omitted). *See also Osburn v. State,* 2009 Ark. 390, 326 S.W.3d 771.

In the case before this court, Stevenson invoked his right to counsel. When Addison ‖₈told Stevenson that any further contact with law enforcement would only be upon written request, Stevenson said to Addison that "he would rather just go ahead and get this over with and talk to me now. He didn't want to have to go through that aspect of writin' a letter." While this statement is in response to the declaratory statement by Addison regarding how to contact the police, Addison's statement was not during interrogation and was not a statement that would reasonably elicit an incriminating response. Stevenson expressed a desire to go ahead with the interview, and that he wished to speak with law-enforcement officers. The circuit court's denial of Stevenson's motion to suppress was not clearly against the preponderance of the evidence and we affirm its decision.

 Stevenson also asserts that the circuit court erred in denying his motion for mistrial. A mistrial is a drastic remedy that should be granted only when justice cannot be served by continuing the trial. *Jones v. State,* 2012 Ark. 38, at 3, 388 S.W.3d 411, 413. A circuit court's decision whether to grant a mistrial will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Id.,* 388 S.W.3d at 413. Stevenson alleges that a mistrial was required because the State told the jury in opening statement that he had invoked the right to counsel. In relevant part, the State's opening statement was as follows:

Lieutenant Addison questions, as he should, the suspect. Lieutenant Addison was very careful to [e]nsure the defendant was aware of his rights. He

has a right to a lawyer. He has a right not to give any statement. He made sure he was aware of those rights. And then the defendant initially said I want to talk to a lawyer.

Stevenson's attorney asked permission to approach the bench and stated to the circuit court that "[t]he court excluded the first statement or any reference to it. The prosecutor has just provoked a mistrial by inadmissible commenting on what is clearly prejudicial." The circuit court denied the mistrial and gave a curative instruction.

A review of the record reveals that the circuit court ruled that the audio and the video recording of the first interview in which Stevenson invoked the right to counsel "wouldn't be played at trial." Stevenson confirms this in his argument on appeal, asserting that, "[d]uring the pre-trial hearing on the Appellant's Motion to Suppress, the trial court, in its ruling, stated that statement one would not be played at trial."

Both Stevenson and the State rely on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The issue in *Doyle* was "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Id.* at 611, 96 S.Ct. 2240 (footnote omitted). The Court in *Doyle* stated:

> The warnings mandated by that case [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, *see Michigan v. Tucker,* 417 U.S. 433, 443–444 [94 S.Ct. 2357, 41 L.Ed.2d 182] (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or

> appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. *See United States v. Hale, supra,* 422 U.S. [171], at 177 [95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) ]. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 617–18, 96 S.Ct. 2240 (footnotes omitted). The Court in *Doyle* held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. 2240 (footnote omitted). This court similarly held in *Jarreau v. State,* 291 Ark. 60, 722 S.W.2d 565 (1987), and *Hobbs v. State,* 277 Ark. 271, 641 S.W.2d 9 (1982).

The State cites this court to *Holden v. State,* 290 Ark. 458, 721 S.W.2d 614 (1986). Strikingly similar to the present case, in *Holden* the prosecution stated in opening statement as follows:

> The defendant is arrested and he is read his Miranda rights, and during the course of those rights as they are read to him he states, I want a lawyer. So Officer Howard of the Arkansas State Police folds his papers up, and he says all right, there will be no more questions. Officer Howard stopped asking questions.

*Holden,* 290 Ark. at 461, 721 S.W.2d at 615. In *Holden,* "[t]he specific legal argument on appeal is that it was a comment on the defendant's right to remain silent which can be prejudicial error." *Id.* at 462, 721 S.W.2d at 615. This court stated that the "legal issue to us is whether this was a comment on the right of a defendant to remain silent or whether it was a prejudicial comment requiring a mistrial." *Id.,* 721 S.W.2d at 616. We concluded that the case was not exactly the same as in *Doyle.* "There was no direct reference by the state to the defendant's silence or emphasis that the defendant refused to make a statement, which is the error addressed in *Doyle.*" *Id.,* 721 S.W.2d at 616.

In *Holden,* as in the present case, the defense moved for a mistrial, asserting that the attention of the jury was focused on invocation of the constitutional right to a lawyer. The defense argued that "this could lead the jury to believe the defendant was trying to hide something." *Holden,* 290 Ark. at 462, 721 S.W.2d at 615. We noted that "[t]he state simply mentioned what was said immediately before Holden asked two questions which were admitted." *Id.,* 721 S.W.2d at 616. As in the present case, in *Holden,*

it was not cross-examination emphasizing Holden's silence to the jury. While Holden's exercise of his constitutional right to a lawyer was mentioned, it was not a calculated reference to Holden's silence. The appellant has cited no case holding such a statement is of such a prejudicial nature that it will prevent a fair trial.

*Holden,* 290 Ark. at 462, 721 S.W.2d at 616. In *Holden,* as in the present case, "[n]o mention was made during the trial about the silence of the defendant, or the fact that he had asked for a lawyer." *Id.* at 464, 721 S.W.2d at 616. Here, a curative instruction was given at the time of the comment in the State's opening statement, and no mention was made during trial about Stevenson's silence or assertion of the right to counsel. Unlike the situation in *Doyle,* Stevenson was not cross-examined regarding his assertion of the right to remain silent, and there was no attempt to impeach Stevenson's account at trial with the assertion of his *Miranda* rights. Under *Doyle,* "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle,* 426 U.S. at 619, 96 S.Ct. 2240. But Stevenson offers no convincing authority for his argument that the mention in opening statement that a defendant invoked the right to counsel and then retracted that assertion and spoke to law enforcement constitutes a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We cannot say that the circuit court erred in refusing to grant a mistrial. *See Holden.*

Stevenson next argues that the circuit court abused its discretion in admitting evidence of prior crimes under Arkansas Rule of Evidence 404(b), which provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"The test for establishing motive, intent, or plan is whether the prior bad act has independent relevance." *Fells v. State,* 362 Ark. 77, 84, 207 S.W.3d 498, 503 (2005).

█ At issue are two prior crimes involving Stevenson's use of a knife. To sustain the charge of first-degree murder under the facts of this case, the State had to prove that with the purpose of killing another person, Stevenson killed another person. *See* Ark.Code Ann. § 5–10–102(a)(2). Dr. Erickson testified that one stab wound severed Fox's external jugular vein. Dr. Erickson characterized this as "a very serious stab wound." Another stab wound severed Fox's brachial artery and nerves in his arm that rendered the arm useless. The third stab wound pierced Fox's lung, causing it to collapse. The question asked of the jury was whether Stevenson committed the stabbing with the purpose of causing Fox's death. The manner in which the wounds were administered was lethal and quickly caused Fox's death. From the evidence of the two prior crimes involving Stevenson's use of a knife, the jury could infer that, based on Stevenson's skill with a knife, the wounds were intentionally inflicted in the manner they were, and in the place they were, for the purpose of causing death. The evidence was relevant to prove the elements of the charged crime of first-degree murder, and the prior crimes, independent of revealing other crimes, were relevant to prove intent in the charged crime and were therefore admissible.

█ Stevenson finally argues that the circuit court abused its discretion by admitting a cast of the knife form found in the seized knife box. Within the knife box was a form into which the knife fit when the knife was placed in the box. The State had a casting made to show the shape of the knife that the box held. Stevenson admitted that at one time, he had stored a knife in the box, but he asserted that he had sold it. Atchley had seen the knife prior to the evening Fox was killed and testified that it had been kept in the bedroom she and Stevenson occupied. Atchley testified that, shortly after stating he would assure no one thought he was a "pussy," Stevenson left and then returned to the bedroom for a few moments before going outside where Fox was stabbed. Addison found the dresser drawer open, the knife-box bottom and the box lid on the bathroom floor, consistent with Stevenson's grabbing the knife and dropping the box as he hurriedly ran outside with it. Dr. Erickson testified that the wounds were not inconsistent with Exhibit 75, the cast of the knife. Absent an abuse of discretion, the circuit court's decision on admission of evidence will not be reversed. *See Riley v. State*, 2012 Ark. 462, 2012 WL 6218479. We find no abuse of discretion.

In compliance with Arkansas Supreme Court Rule 43(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Stevenson, and no prejudicial error has been found.

Affirmed.

BAKER AND HART, JJ., dissent.

KAREN R. BAKER, Justice, dissenting.

Because I believe that Stevenson's two prior crimes are inadmissible, I respectfully dissent. I cannot agree with the majority that the admission of the two prior crimes had any relevance to Stevenson's intent to kill Fox in this case. The test for establishing motive, intent, or plan as a Rule 404(b) exception is whether the evidence of the other act has independent relevance. *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997). The intent to commit a crime is a state of mind that is not ordinarily capable of proof by direct evidence, and so it must be inferred from circumstances. *Gillie v. State*, 305 Ark. 296, 808 S.W.2d 320 (1991). Yet, Stevenson's prior crimes involving the use of a knife, the first in 1996, and the second in

2008, could not be construed as evidence of Stevenson's intent to kill Fox. Neither incident demonstrated he had any particular skill in causing lethal wounds with a knife nor that causing a lethal wound was his purpose. Further, the evidence was not relevant to show Stevenson's purpose or intent in stabbing Fox was to kill Fox. Because the introduction of this evidence was clearly prejudicial, and not independently relevant, it was not admissible under Rule 404(b). I would reverse and remand for a new trial.

JOSEPHINE LINKER HART, Justice, dissenting.

I do not question the sufficiency of the evidence. The State had an extraordinarily strong case that included admissions by the accused, a 911 call where the victim identified the accused as the perpetrator, evidence placing the accused in the presence of the victim at the time of the murder, statements by the accused that he was going to confront the victim, and the presence of the victim's blood on the accused's shoe. Securing an uncounseled confession after the accused asked for a lawyer, introducing evidence that clearly violated Arkansas Rule of Evidence 404(b), and introducing a plaster cast of a knife to simulate the murder weapon added nothing to the case.

## I. *Uncounseled Interrogation After Stevenson Requested a Lawyer*

When an accused has invoked his Fifth Amendment right to counsel during custodial interrogation, he cannot be subjected to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Osburn v. State*, 2009 Ark. 390, 326 S.W.3d 771 (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The "impetus" for further contact with the police must come from the accused, not the police. *Id.* Here, as in *Osburn*, it is undisputed that Stevenson invoked his right to counsel, so the question is whether the "impetus" for further contact with the police came from Stevenson.

Under our standard of review of a circuit court's refusal to suppress a confession, we are supposed to makes an independent determination based upon the totality of the circumstances, and we reverse the circuit court if its finding of voluntariness is clearly against the preponderance of the evidence. *Id.* The only evidence in this case regarding the voluntariness of Stevenson's uncounseled confession comes from Paragould Police Department Investigator Mike Addison. Addison candidly acknowledged that he did not stop talking to Stevenson after Stevenson invoked his right to counsel until Stevenson agreed to continue the interrogation. The twelve-minute gap between what he called the "first interview" and the "second interview" was attributed to the time he needed to contact the prosecutor to advise him what he had accomplished. According to Addison, after Stevenson invoked his right to counsel, Addison was merely offering "advice on how to get in touch with me." Addison also admitted that, while he was offering Stevenson that "advice," Stevenson told him he "sure couldn't afford a lawyer." Because *Miranda* guarantees an accused the right to a lawyer, whether or not he can afford one, this shows that the waiver on Stevenson's part was not knowingly and intelligently made, otherwise he would have known that he would have representation regardless of the state of his finances. I would hold that the trial court erred in refusing to suppress Stevenson's uncounseled custodial confession.

## II. *Arkansas Rule of Evidence 404(b)*

Over Stevenson's objection, the State introduced police testimony concerning two criminal incidents in which Stevenson had used a knife. The first incident occurred in 1996. At Stevenson's trial, Jeffery Gladish, who was working in a pizzeria at the time, but is now a corrections officer, testified that he saw a black man and a white man meet and have a conversation. Gladish stated further, "Suddenly, the black male started stabbing the white male." The white male tried to escape, and the black male stabbed him twice in the back. Pursuing the victim as he tried to run away, the black man screamed, "I'm going to kill you." Gladish identified Stevenson as the black man. Kenneth Huckabay likewise testified that he saw a black man stab a white man in the back with a knife. Mike Addison testified that Stevenson was arrested for the stabbing and was charged and convicted of aggravated battery.

The State introduced evidence of the second incident, aggravated assault on a family member, which occurred in 2008, through the testimony of Jack Hailey. Hailey worked for the Paragould Police Department, and he was chosen by the State to testify because there were "inconsistencies" in the victim's story. Hailey stated that he was called to the residence of a Ms. Stevenson, who told him that she was asleep when Stevenson came in brandishing a knife. He demanded her car keys, and when she surrendered the keys, Stevenson put the knife on a table and left.

Arkansas Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, op-

portunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To be admissible under Rule 404(b), this court has stated that such evidence must be independently relevant. *Rollins v. State*, 362 Ark. 279, 208 S.W.3d 215 (2005).

Here, the majority contends that the evidence of Stevenson's prior criminal knife use was relevant because the jury could "infer that, based on Stevenson's skill with a knife, the wounds were intentionally inflicted in the manner they were, and in the place they were, for the purpose of causing death." This analysis does not survive close scrutiny.

For prior bad acts to be admissible, there must be a very high degree of similarity between the charged crime and the prior act. *McGehee v. State*, 338 Ark. 152, 171, 992 S.W.2d 110, 121 (1999). Both of the incidents fail this test. First, Stevenson did not kill anyone in either of the two prior incidents. In the 2008 aggravated assault on a family member, he did not even scratch the victim. In the 1996 incident, the victim was stabbed multiple times, yet survived. Presumably the remoteness in time from the stabbing has allowed the majority to *infer* that Stevenson has spent the last sixteen years honing his knife skills. There was no testimony that Stevenson was particularly skilled with a knife.

### III. *Introducing a Plaster Cast of a Knife to Simulate the Murder Weapon*

The State commissioned a junior high school teacher to make a plaster cast of the indentation of a knife box to show what the murder weapon might have looked like. Stevenson argues that the concoction was more prejudicial than probative, and I must agree. While the knife box, which

was found in Stevenson's room could arguably have some probative value, the handiwork of an amateur criminologist does not. This trial error is ⎿18indefensible. Perhaps that is why the majority has chosen not to defend it-it only discusses the knife box in its opinion.

Given these evidentiary errors, this case should be reversed and remanded for a new trial.