Robert WYLES  *v.*  STATE of Arkansas

CR 06-1031                                      249 S.W.3d 782

Supreme Court of Arkansas
Opinion delivered February 8, 2007

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

A<small>NNABELLE</small> C<small>LINTON</small> I<small>MBER</small>, Justice. A jury convicted Appellant Robert Wyles of second-degree murder in the death of his wife, Lisa Wyles, and sentenced him to twenty years in prison. We take jurisdiction of this appeal pursuant to Ark. Sup. Ct. R. 1-2(a)(7) (2006), as this is Wyles's second appeal. We reversed his first conviction of first-degree murder and remanded the case for retrial, holding that the circuit court erred in refusing Wyles's proffered jury instructions on the lesser-included offenses of second-degree murder and manslaughter. *See Wyles v. State*, 357 Ark. 530, 182 S.W.3d 142 (2004). As his sole point for reversal in this appeal, Wyles contends that the circuit court erred in denying his motion for a directed verdict. We find no error and affirm the judgment of the circuit court.

As a threshold matter, we note that the State suggests that Wyles did not preserve his sufficiency challenge for appellate review. In particular, the State cites *Thomas v. State*, 330 Ark. 442,

954 S.W.2d 255 (1997), for the proposition that a defendant waives any reliance on a motion for directed verdict at the close of the State's case if the defendant presents additional testimony. The rule of law cited by the State is, however, not dispositive when a defendant properly renews a directed-verdict motion after presenting a defense. Ark. R. Crim. P. 33.1 (2006). Here, Wyles renewed his directed-verdict motion as to the second-degree murder charge after presenting his defense. We therefore conclude that his challenge to the sufficiency of the evidence has been preserved for appellate review.

On appeal, a motion for directed verdict is reviewed as a challenge to the sufficiency of the evidence. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). When reviewing the sufficiency of the evidence on appeal, this court does not reweigh the evidence but determines instead whether the evidence was substantial. *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004) (quoting *Hale v. State*, 343 Ark. 62, 74, 31 S.W.3d 850, 857 (2001)). Substantial evidence is evidence, direct or circumstantial, that is forceful enough to compel reasonable minds to reach a conclusion one way or another and that goes beyond mere speculation or conjecture. *Id.* In determining whether there is substantial evidence, this court reviews the evidence in the light most favorable to the State. *Id.* Additionally, only evidence supporting the verdict is considered, and this court will affirm if there is substantial evidence supporting the verdict. *Id.*

Circumstantial evidence may constitute substantial evidence to support a conviction. *Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006). Guilt can be established without direct evidence and evidence of guilt is not less because it is circumstantial. *Id.* The longstanding rule is that for circumstantial evidence to be substantial, it must exclude every other reasonable hypothesis than that of guilt of the accused. *Id.* Stated another way, circumstantial evidence provides a basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Such a determination is a question of fact for the jury to determine. *Id.* We will disturb the jury's determination only if the evidence did not meet the required standards, leaving the jury to speculation and conjecture in reaching its verdict. *Id.*

Wyles and the victim, Lisa, were married in 1981 and had three children together. In late 1999, Lisa left Wyles and moved in with a male co-worker, Jason Crow. However, by the spring of 2000, she had returned to live with her family. Hoping for a fresh

start, Wyles quit his job, collected his profit-sharing benefits from his employer, and moved the family to Dover.

Despite his efforts, the couple's relationship had deteriorated again by the following year. Wyles was unemployed, and they were experiencing financial problems. Lisa had begun to complain about their life in Dover, and Wyles became increasingly worried that she would leave him again. In August 2001, Wyles met Carolyn Carpenter Moser and began an intimate relationship with her. On Moser's birthday in October, he gave her a ring and flowers and told Moser that, if Lisa left him again, she could move into his house.

A few days later, on Thursday, October 25, 2001, Wyles waked Lisa during the early morning hours and confessed to having an affair with Moser. The couple then discussed the situation with their daughter Trisha, and Lisa decided that she wanted to leave. But, by that afternoon, the couple told their daughter that they had reconciled. In the early evening, they drove Trisha to Benton where she planned to spend the weekend with a friend.

As to what transpired next, Wyles testified at trial that Lisa's death was purely accidental. According to his testimony, he and Lisa spent a nice evening together after they dropped off Trisha in Benton and returned to Dover. The next morning, however, Lisa started arguing with him about Moser and began to hit and push him. In order to restrain Lisa, Wyles grabbed her in a headlock, spun her around, and slammed her down onto the foot of their bed. They hit the foot board, and Wyles fell on Lisa's back. Moments later, Wyles realized that Lisa was not moving or breathing.

Instead of calling 911, Wyles panicked, wrapped Lisa in a comforter, and deposited her body in a closet. Later, he buried Lisa's body in the backyard of his home and placed a large metal barrel on top of her grave. Wyles took most of Lisa's personal belongings to a storage building rented in his name. He then used Lisa's driver's license to obtain her paycheck and cash the check at a local bank. A few days later, Wyles secured a check drawn on Lisa's IRA account in the amount of $1,500.

On the evening after Lisa's death, Wyles visited Moser and told her that Lisa had left him again and that he had taken her to meet Crow in Conway. Later that weekend, Wyles and Moser traveled to Tunica, Mississippi, where they shared a hotel room

and were sexually intimate. On Sunday, Wyles and Moser returned to Arkansas and stopped in Benton to pick up his daughter, Trisha. To explain Lisa's disappearance, Wyles told Trisha the same story that he had told Moser. Within a month, Moser had moved in with Wyles.

In November and December of 2001, James Fitzgerald, a friend of Wyles's son, stayed at the Wyles home. During that time, Wyles asked Fitzgerald to drive his truck over the barrel, which Fitzgerald did not know was located on top of Lisa's grave in the backyard. He instructed Fitzgerald to wait until nightfall and to leave the truck's headlights off. Once Fitzgerald complied with his request, Wyles covered the barrel with sod.

In February 2002, Wyles and Moser moved to Knoxville, Tennessee. That same month, state and local law enforcement officers began investigating a missing person's report on Lisa. Their investigation eventually led to the discovery of Lisa's body and her personal belongings. Wyles was arrested in Knoxville and soon confessed to accidentally killing his wife.

At trial, the state medical examiner, Dr. Charles Kokes, testified that Lisa sustained multiple rib fractures of the front and back ribs on her left side, a punctured left lung, and a fracture of her lower mandible, or jaw. He opined that the rib fractures were all inflicted at the same time from a single application of a strong compressive force.[1] Dr. Kokes also concluded that the jaw fracture was not caused by the same broad force that caused the rib fractures. Lisa's jaw bone had snapped in two, which required a considerable amount of force — possibly enough to render someone unconscious. Thus, Dr. Kokes testified that a separate and discrete blow to the jaw caused the jawbone to fracture. Due to the position of Lisa's body in the grave, the medical examiner did not attribute any of her injuries to a truck being driven over the grave.

In light of the extensive hemorrhaging in Lisa's left lung, Dr. Kokes concluded that she died of respiratory arrest as a result of the production of pneumothorax when the broken ribs punctured the lung. He further testified that Lisa's death was not instantaneous and could have resulted anytime from a few minutes to hours after she was injured.

---

[1] Dr. Kokes testified that rib fractures like Lisa's commonly occur during automobile accidents when a vehicle rolls over.

On appeal, Wyles argues that the State did not present sufficient evidence to prove the *mens rea* element of the charged offense. A person commits second-degree murder in either of two ways. The first is when a person, "[k]nowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. § 5-10-103(a)(1) (Repl. 2006). A person acts knowingly with respect to his conduct or the attendant circumstances when he "is aware that his . . . conduct is of that nature or that the attendant circumstances exist," and he acts knowingly with respect to the result of his conduct when "he . . . is aware that it is practically certain that his . . . conduct will cause the result." Ark. Code Ann. § 5-2-202(2)(A)&(B) (Repl. 2006). This court has defined "extreme indifference" as deliberate conduct that culminates in the death of another person. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998).

A person also commits second-degree murder if "[w]ith the purpose of causing serious physical injury to another person, . . . [he] causes the death of any person." Ark. Code Ann. § 5-10-103(a) (Repl. 2006). One acts purposely with respect to his conduct or the result of his conduct when it is his "conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2006). Serious physical injury is a "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(21) (Repl. 2006).

■ This court has recognized that a person's intent or state of mind at the time of the offense is seldom apparent. *Harshaw v. State*, 348 Ark. 62, 71 S.W.3d 548 (2002). However, a person is presumed to intend the natural and probable consequences of his actions. *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004). Intent also can be inferred from the type of weapon used, the manner of use, and the nature, extent, and location of the trauma suffered by the victim. *Harshaw v. State, supra*. Here, the jury could infer from the medical evidence alone that Wyles intended to commit second-degree murder. Lisa sustained several serious injuries — namely multiple rib fractures, a jaw fracture, and a punctured lung — that were inflicted using a considerable amount of force. Given the extent of Lisa's injuries and the location of those injuries in vital areas of her body, the jury could reasonably

infer that Wyles acted either under circumstances manifesting extreme indifference to the value of human life or with the purpose of causing serious physical injury to his wife.

■ In addition, this court has also held that efforts to conceal a crime, as well as lying to friends and police about one's involvement in a killing, can be considered evidence of consciousness of guilt. *Coggins v. State, supra.* In the instant case, Wyles lied to his family and friends regarding Lisa's disappearance. He also acted affirmatively to conceal the killing by burying Lisa, covering her grave with a barrel and sod, and storing her personal belongings in his storage unit. Thus, the jury could have inferred Wyles's guilt from his efforts to conceal the crime from the authorities and his family and friends.

■ Wyles further contends that his testimony that Lisa died accidentally was corroborated by the medical evidence, and therefore the jury could not have found him guilty without resorting to speculation and conjecture. This court has repeatedly held that the weighing of evidence and witness credibility are matters left solely to the discretion of the jury. *Jones v. State,* 269 Ark. 119, 598 S.W.2d 748 (1980). The jury is responsible for resolving inconsistent testimony and is entitled to believe the State's account of the facts over the defendant's. *Brunson v. State, supra.* Consequently, the jury was entitled to disbelieve Wyles's story and to conclude that Wyles intended to injure and kill Lisa. Moreover, his testimony that all of Lisa's injuries occurred when he fell on her is inconsistent with the medical evidence that the rib and jaw fractures were inflicted at two separate times with two different applications of force. Actually, the medical evidence is more consistent with a conclusion that Wyles brutally beat his wife, perhaps by knocking her out with a blow to the jaw and then stomping or jumping on her rib cage.

Finally, Wyles claims that Carolyn Carpenter Moser's testimony was the only evidence of his intent and completely lacked credibility. Moser testified that when she visited Wyles in jail, he confessed to killing Lisa. According to Moser, Wyles said that Lisa tried to attack him with a kitchen knife and he grabbed Lisa in a headlock and punched her in the head. On cross-examination, Moser admitted that she did not tell anyone about the confession until the day before his second trial. Wyles argues that Moser's testimony was clearly unbelievable because she neither told police

about the confession nor testified about the confession at his first trial. He also suggests that Moser's testimony is inconsistent with the medical evidence and is therefore physically impossible.

The trier of fact is free to assess inconsistencies in witness testimony. *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975). This court will not pass upon the credibility of a witness and has no right to disregard the testimony of any witness after the jury has given it full credence, unless the testimony is inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon. *Id.* Furthermore, this court has held that the issue of a witness's inconsistent statements is a matter of credibility left to the jury's discretion. *Kitchen v. State*, 271 Ark. 1, 607 S.W.2d 345 (1980).

While Moser's testimony certainly would have been subject to challenge, the issue of her credibility as a witness was properly left to the jury. Our conclusion on this point is bolstered by the fact that Wyles's counsel used Moser's inconsistent statements to impeach her during cross-examination. Moreover, Moser's testimony was not physically impossible. In fact, her testimony that Wyles punched Lisa in the head is consistent with the medical evidence that Lisa's jaw fracture resulted from a single discrete blow to the jaw. We therefore conclude that there was substantial evidence to support the jury's verdict, and we affirm.

Affirmed.