Cite as 2019 Ark. App. 600

# ARKANSAS COURT OF APPEALS

DIVISIONS II & III
No. CR–19–250

| | | |
|---|---|---|
| | | **Opinion Delivered:** December 11, 2019 |
| JOSE GONZALES | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTH DIVISION [NO. 60CR-17-3015] |
| | APPELLANT | |
| V. | | HONORABLE BARRY SIMS, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | REVERSED AND REMANDED |

## KENNETH S. HIXSON, Judge

Jose Gonzales appeals after he was convicted by a Pulaski County Circuit Court jury

of murder in the second degree and was sentenced as a habitual offender to serve 660

months' imprisonment. On appeal, appellant contends that (1) there was insufficient

circumstantial evidence to support his conviction, (2) the trial court abused its discretion by

allowing prior bad-act evidence that was not independently relevant and was unduly

prejudicial, and (3) the trial court abused its discretion when it denied his motion for mistrial.

We reverse and remand for a new trial.

### I. *Relevant Facts*

Naomi Estrada was murdered. Naomi's family found her naked body underneath a

flattened cardboard box in the crawlspace of their home on July 2, 2017. The medical

examiner determined that the cause of death was strangulation. A belt was found near the

body, and although the belt buckle contained hair samples from the victim, the medical examiner could not conclusively determine that the belt was used in the murder. After an investigation, appellant was arrested and charged with capital murder in violation of Arkansas Code Annotated section 5-10-101 (Supp. 2017) and as a habitual offender under Arkansas Code Annotated section 5-4-501(b).

The State indicated that it was going to call Mary Wooten as a witness at the trial. Appellant filed a motion in limine to exclude evidence of prior alleged acts of domestic violence that involved Ms. Wooten and appellant pursuant to Arkansas Rules of Evidence 404(b) and 403. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*" (Emphasis added.) Rule 403 states as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

At the pretrial hearing on the motion, Ms. Wooten, appellant's former girlfriend and the mother of appellant's children, testified that appellant had choked her on a few prior occasions when they were in a relationship together. The last incident was two years earlier in 2015. She explained that on those few occasions, when they would argue, appellant would choke her using only his hands until she lost consciousness. When she would wake up, her wrists would be twitching. The blood vessels in her eyes never ruptured, and she

2

stated that she would only lose consciousness for a second or two. Ms. Wooten stated that appellant never used a belt and that the incidents were never anything sexual. She was never naked when these events occurred, and they happened only during an argument after she had initiated physical contact.

The State argued that Ms. Wooten's testimony was admissible pursuant to Rule 404(b) because it went to appellant's knowledge, intent, and absence of mistake[1] and not to prove appellant's character in order to show that he acted in conformity therewith. The State explained that Ms. Wooten's testimony describing that appellant had previously choked her showed that he had the practice and knowledge of how to strangle a person, and it contended that the evidence at trial would show that Naomi had been strangled to death. Appellant countered that this was not the type of case that the knowledge exception applied and that there were insufficient similarities between the two allegations. Appellant explained that nothing in Ms. Wooten's testimony indicated that he had specific knowledge of the force and length needed to strangle someone. Although the State generally argued that Ms. Wooten's testimony was also evidence of appellant's intent and the absence of mistake, appellant disagreed. Appellant alleged that his defense was not that the death was a mistake but rather that he did not do it. Moreover, the State did not charge appellant with an offense in which mistake would be an appropriate defense, as in manslaughter or an unintended consequence from a sex act. Instead, the State charged him with capital murder.

---

[1]Although there was some discussion about whether Ms. Wooten's testimony was independently relevant as to appellant's motive, the jury was not instructed that it could consider Ms. Wooten's testimony for this purpose. Therefore, we do not further discuss those arguments.

3

Finally, appellant argued that Ms. Wooten's testimony was inadmissible under Arkansas Rule of Evidence 403 even if it was admissible under Rule 404(b). After hearing oral argument, the trial court agreed with the State and denied appellant's motion in limine without comment. A jury trial was held on December 4–5, 2018.

At trial, the timeline of events surrounding Naomi Estrada's disappearance, the eventual discovery of her body, and appellant's connection to the murder was established through the testimony of Naomi's mother, Jessica Estrada; her sister, Dorcas Estrada; her brother, Elias Estrada; and her friend, Brianna Young.

Naomi and her two-year-old young son were living in the home of her parents, Jessica and Juan "Johnny" Estrada, in the summer of 2017. The house was a split level with exterior entrances on both levels. Naomi's and her son's bedrooms were downstairs, and the door to the basement crawlspace was in her son's bedroom.

Appellant was homeless, and the record is unclear how the appellant and Naomi met each other and became friends. However, in June and July 2017, appellant visited the Estrada house several times. Appellant would sometimes enter through the lower-level exterior door and spend the night. The record is also unclear of the extent of the relationship between Naomi and appellant and whether it was intimate or just as friends. Although the Estrada family indicated Naomi and appellant were just friends, appellant refers to Naomi as his "current girlfriend" in one part of his brief. Regardless, testimony was presented that appellant was homeless and that Naomi was trying to help him. There was further testimony that appellant and Naomi would sometimes use recreational drugs together.

4

On the evening of June 30, 2017, Naomi borrowed her mother's car and left the Estrada house. Only Jessica and Naomi had keys to the car. Naomi also borrowed her mother's cell phone. No one heard from Naomi the remainder of that evening. Jessica testified that the following morning around 11:00 a.m., Naomi called her at work and told her that she had spent the night at her Aunt Phoebe's house and that she was going to go hiking that afternoon. They agreed that Naomi would pick Jessica up from work at 4:00 or 4:30 p.m. However, Jessica testified that Naomi did not arrive at her workplace as previously arranged. When Naomi did not arrive, Jessica made a few calls to the cell phone that she had loaned to Naomi, but Naomi did not answer. Jessica got Dorcas (Naomi's sister) to pick her up and take her home, where she arrived between 5:00 and 5:30 p.m.

When Jessica arrived home, she observed her car in the driveway. Appellant was coming out of the house holding Jessica's phone that Naomi had borrowed. Jessica asked appellant why he had her phone, and he replied that he was waiting for a call from his sister in Houston who was sending him money so that he could visit. Jessica asked him where Naomi was, and appellant told her that Naomi was sick and sleeping downstairs. Jessica took her phone from appellant.

Jessica entered the upper level of the home and saw that her husband, Johnny, was there. She also saw Brianna Young, Naomi's friend, who was standing by the door leading to the lower level of the house. Appellant reentered the house, went downstairs, came back upstairs, and then left with Brianna.

In the meantime, according to Brianna's testimony, Brianna had sent Naomi a message on Facebook around 4:15 p.m. that day asking if Naomi was home and if she could

5

come over. Brianna got a "thumbs up" emoji in return at 4:49 p.m., and Brianna went to the Estrada home, arriving about fifteen minutes later. Upon arriving at the Estrada home, Brianna went downstairs with appellant. When she did not find Naomi downstairs, she asked him where Naomi was. Appellant told her that Naomi had gone somewhere with her aunt. When Brianna told appellant about her recent Facebook message to Naomi and the "thumbs up" she received in reply, appellant adamantly told her that it did not happen. Brianna saw clothes on Naomi's bed, but it did not look like there was a person sleeping in the bed. The two then went upstairs, where Jessica saw them when she arrived home from work.

After appellant told Jessica that Naomi was downstairs asleep, he asked Brianna to take him to get some beer. Brianna agreed, and appellant went back downstairs to retrieve his tablet computer, which he used to communicate with people on Facebook. When he returned, he and Brianna left. A short distance from the house later, appellant told her he did not have enough money and asked her to take him back to the house. Brianna testified that she saw that he had some cash and heard change rattling in his pockets. However, she drove him back to the house and dropped him off; she never heard from either Naomi or appellant again.

Meanwhile, when appellant was gone with Brianna to buy beer, Naomi's brother, Elias, came to the house to drop off something for Jessica. Elias left without going inside. Dorcas also came to the house that evening to drop off some laundry downstairs for Jessica to do for her, and Jessica (apparently relying on appellant's statement) told Dorcas to be quiet because Naomi did not feel well and was downstairs asleep in her room. Dorcas

6

testified that when she went downstairs, she saw what looked like the body of a person in Naomi's bed. She also saw appellant (who Brianna had dropped back at the house by that point) go from Naomi's room to the bathroom, and she said he was kind of dirty looking. She subsequently went back upstairs and left.

Jessica explained that it was later that night that she first went downstairs to check on Naomi, but she found only pillows in the bed with the covers pulled over them to look like someone was in the bed. Frightened, Jessica called out to her husband, Johnny, and told him Naomi was not there. A few minutes later, as Jessica was about to go upstairs, appellant rushed out of the child's bedroom and sat on the stairs "hollering and screaming." Jessica stated that although she had not seen appellant come back after leaving with Brianna, he must have entered the house through the exterior back door on the lower level. Jessica asked appellant where Naomi was and what he had done with her, and appellant told her they had gone out to the woods hiking to look for some of his clothes he had left in the woods. Jessica testified that after she asked appellant again what he had done with her daughter, appellant would not look at her. Instead, he continued to holler and scream, said something about sex, and looked "like an animal." Appellant finally told Jessica that Naomi left on foot with a black man to buy marijuana. Jessica was able to get past appellant and go upstairs, where she told her husband what appellant had said.

At that point, Jessica gave Johnny her car keys, and Johnny and appellant left to go looking for Naomi. However, they returned without finding her. After Jessica and Johnny had just started downstairs to look for Naomi, appellant fled the house and sped off in Jessica's car without her permission. Jessica explained that she still had her set of car keys at

7

that point.  Thus, the only other set of keys appellant could have used was Naomi's set. According to the Estrada family, appellant never contacted them again after he stole the car.

After appellant left, Jessica called Naomi's siblings, Elias and Dorcas, to come to the house.  Jessica called the police around 8:00 p.m. and waited for an officer to arrive to take her statement.  In the meantime, Elias looked through the lower level of the house for Naomi, and he entered the crawlspace during his search.  Elias stated that the crawlspace was dark, so he used his cell phone for light.  He saw a flattened cardboard box on the floor of the crawlspace, but he did not look under it because it was flat and did not appear to have anything under it.  Elias saw the purse Naomi always carried in her room.  Dorcas testified that it was empty.  The contents normally included Naomi's diabetic medication, her makeup pouch, her wallet, and her keys.  Dorcas testified that it was not normal for Naomi to just disappear or fail to call to check on her son.

Jessica said that because no police officer came to the house to take her statement, the family eventually went to the police station to report Naomi's disappearance and the stolen car.  When they returned home, they locked the house and left, leaving their pit bulldog there alone for the night. Jessica and Johnny spent the night at Dorcas's house.  No one received a call from Naomi.

The next morning, on July 2, 2017, Jessica and Johnny returned to their house with Dorcas and looked for Naomi.  Johnny ultimately found Naomi's dirty body in the basement crawlspace wrapped in plastic in a hole in the dirt floor under the flattened cardboard box. Jessica called 911 around 8:15 a.m.

The Little Rock Police Department Crime Scene Search Unit worked the crime scene. They collected as evidence a black trash bag at the end of the driveway, which the family suspected had been placed there by appellant. It contained some trash and other items, including an empty prescription pill bottle for Naomi's diabetes medication and an empty syringe that appeared to match two syringes found by her body. Naomi's bed looked as though it had been disturbed, and a dirt-like substance was found on the sheet. In the area where Naomi's body was found, there was a belt with hairs in the buckle and the large cardboard box that had covered her body. Photographs of Naomi's body just after its discovery showed that she had blood or an injury on one knee and dirt on her body, including her legs and feet.

Dr. Adam Craig, a forensic pathologist, testified that he performed the autopsy on Naomi Estrada on July 3, 2017. He confirmed that her body had dirt on it. Craig determined that her cause of death was strangulation. He testified that in the process of strangulation, a person would lose consciousness after around fifteen seconds and that it would take a minute or two before the person would be brain dead. He noted that the person would shake during the process and that there probably would be at least two episodes of the person bringing her arms up and shaking, then letting go.

Dr. Craig testified that Naomi's head had very prominent purple-red coloration, showing blood congestion in her head, and there was hemorrhaging in the whites of her eyes, both signs of strangulation. There were some abrasions on her neck. He testified that it was possible that a belt was used at some point during the strangulation, but there was no definite pattern. Dr. Craig noticed that there were two almost horizontal abrasions that may

9

have been from the edges of the belt. However, he could not be sure whether that was caused by the belt and testified that if he had to guess, he would say that it was manual strangulation.

Dr. Craig testified that Naomi also had a few other superficial blunt-force injuries to her body, including several contusions and abrasions on her knees, and they appeared to have been inflicted when she was alive. There was one set of abrasions on her buttocks that indicated her body had been dragged after she died. Dr. Craig could not estimate a time of death. While there were drugs in her system, Dr. Craig opined that she did not die of an overdose.

Appellant was arrested on July 5, 2017, and a DNA swab was taken from him and sent to the Arkansas State Crime Laboratory for testing. Jessica's vehicle was also recovered a couple of days after appellant's arrest. It had been left abandoned in a church parking lot with a flat tire. Emma Hergenreader, a forensic DNA analyst with the Arkansas State Crime Laboratory, testified that she matched DNA from Naomi's fingernail clippings to appellant within scientific certainty. She also matched the DNA from the hair on the belt buckle to Naomi within scientific certainty. Although there was male DNA detected on swabs from Naomi's right hand, right breast and neck, and the leather part of the belt, there was an insufficient amount to allow for identification. There was no male DNA detected on Naomi's vaginal, oral, or rectal swabs. Hergenreader testified that it is possible to find another person's DNA on a person if they live together or share a bed. She further explained that it is "definitively possible for DNA to get stuck under your fingernails if you are

cohabitating." Thus, she could not say "that anything regarding the DNA that [she found caused] the death of Ms. Estrada."

The State presented Mary Wooten as a witness, and Ms. Wooten testified as set forth above in the motion-in-limine hearing. Prior to Ms. Wooten's testimony, the jury was instructed that Mary Wooten's testimony was "merely offered as evidence of knowledge, intent[,] and absence of mistake or accident." Mary also testified that she was on probation for a 2017 possession-of-drug paraphernalia conviction.

Appellant did not testify. The jury subsequently convicted appellant of the lesser included offense of murder in the second degree in violation of Arkansas Code Annotated section 5-10-103, and appellant was sentenced as a habitual offender to serve 660 months' imprisonment. This appeal followed.

## II. *Sufficiency of the Evidence*

Appellant first argues that there was insufficient circumstantial evidence to support his conviction of second-degree murder. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Starling v. State*, 2016 Ark. 20, 480 S.W.3d 158. On an appeal from a denial of a motion for a directed verdict, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* In determining whether there is substantial evidence to support the verdict, this court reviews the evidence in the light most favorable to the State and considers only that evidence which supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.*

11

Circumstantial evidence may constitute substantial evidence to support a conviction. *Wyles v. State*, 368 Ark. 646, 249 S.W.3d 782 (2007). Guilt can be established without direct evidence, and evidence of guilt is not less because it is circumstantial. *Id.* The longstanding rule is that for circumstantial evidence to be substantial, it must exclude every other reasonable hypothesis than that of guilt of the accused. *Id.* Stated another way, circumstantial evidence provides a basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Such a determination is a question of fact for the jury to determine. *Id.* We will disturb the jury's determination only if the evidence did not meet the required standards, leaving the jury to speculation and conjecture in reaching its verdict. *Id.*

A person commits murder in the second degree if he or she knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life or with the purpose of causing serious physical injury to another person, the person causes the death of any person. Ark. Code Ann. § 5-10-103(a). Arkansas Code Annotated section 5-2-202 defines purposely and knowingly as follows:

(1) "Purposely." A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result;

(2) "Knowingly." A person acts knowingly with respect to:

(A) The person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist; or

(B) A result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result

12

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Rose v. State*, 2018 Ark. App. 446, 558 S.W.3d 415. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.* Further, our supreme court has said that flight to avoid arrest is admissible as a circumstance in corroboration of evidence tending to establish guilt. *Drennan v. State*, 2018 Ark. 328, 559 S.W.3d 262. Moreover, our supreme court has additionally held that lying about a crime can indicate a consciousness of guilt, and a jury may properly consider an attempt to cover up one's connection to a crime as proof of a purposeful mental state. *Leaks v. State*, 345 Ark. 182, 45 S.W.3d 363 (2001).

Based on this record, we hold the circumstantial evidence was sufficient to support appellant's second-degree-murder conviction. According to the testimony presented at trial, appellant was the last person to be with Naomi before her death. Further, after Naomi's family lost contact with her, appellant had her car keys and the cell phone her mother had loaned to her. Moreover, he told her family and friends three different stories about where she was—in bed asleep downstairs, with her aunt, and walking with a black man to buy marijuana. When Brianna told him she had gotten a "thumbs up" response from Naomi in answer to a message around 4:49 p.m., he was adamant that that could not

13

have happened, though he did not tell her that he had the phone Naomi would have used to send such a message. Dorcas testified that she saw what appeared to be a person sleeping in Naomi's bed and appellant, who looked dirty, leaving Naomi's bedroom and entering the bathroom. Later Jessica also saw what appeared to be a person in Naomi's bed, but when she went in to check on her daughter, she discovered the pillows placed under the covers to look like a person. Immediately thereafter, appellant rushed out of the child's bedroom (where the crawlspace access was located), blocked Jessica's access to the stairway, started screaming, offered up a story about Naomi's going off on foot with a black man to buy marijuana, accompanied Johnny in the car to go look for her, and then fled the house in the family car that he stole using Naomi's keys when they were unable to find Naomi.

Appellant argues that because Elias said there was nothing under the cardboard when he went into the crawlspace the evening of July 1, 2017, the murder and placement of Naomi's body under the cardboard happened after he had left the house and no longer had access. However, a jury could reasonably reject appellant's argument. Moreover, Naomi's body was found in a hole in the dirt floor underneath the cardboard, which looked flat on the floor of the crawlspace. Appellant additionally argues that because siblings Elias and Dorcas each had been convicted of felonies, they were the more likely suspects and also had the opportunity to kill Naomi. However, the credibility of witnesses is an issue for the jury, and this court will not second-guess the credibility determinations made by the fact-finder. *Drennan*, *supra*. The jury is free to believe all or part of any witness's testimony, to resolve questions of conflicting testimony and inconsistent evidence, and to believe the State's version of the facts rather than the defendant's. *Id*. Viewing the evidence in the light most

14

favorable to the State, as we must, we hold that substantial evidence supports appellant's second-degree-murder conviction.

### III. *Prior-Bad-Act Evidence*

Next, appellant argues that the trial court abused its discretion by allowing prior-bad-act evidence—Mary Wooten's testimony that appellant had previously choked her—that was not independently relevant to satisfy Arkansas Rule of Evidence 404(b) and was unduly prejudicial under Arkansas Rule of Evidence 403. The trial court denied appellant's motion in limine to exclude Ms. Wooten's testimony and allowed her to testify at trial. Before Ms. Wooten's testimony, the jury was instructed that her testimony was "merely offered as evidence of knowledge, intent and absence of mistake or accident." Appellant alleges that the trial court's denial of his motion was in error and that the evidence was admitted merely to show that he is a criminal or a bad person. He summarizes,

> The trial court abused its discretion by permitting the State to adduce evidence that Gonzales choked an ex-girlfriend during previous domestic incidents in his capital-murder trial for the strangulation death of his current girlfriend. Such evidence had no independent relevance, and it did not fall into any one of the listed or known exceptions to Ark. R. Evid. 404(b). Further, any probative value that the evidence had—which Appellant does not concede—was grossly outweighed by the danger of unfair prejudice and confusion of the issues, as this Court has previously held in cases involving prior bad acts involving allegations of domestic violence. The prosecution's remarks during closing argument made clear that the State's intent in introducing such evidence was to prove conformity of conduct rather than any admissible purpose, explicitly encouraging the jury to find him guilty in conformity with his poor character for choking women. This error was incredibly prejudicial, as the State's entirely circumstantial case was anything but overwhelming, and because it encouraged the jury to find Gonzales guilty in conformity with his character rather than on the evidence of his guilt. Gonzales's conviction must be reversed accordingly.

We agree with appellant.

15

The admission or rejection of testimony is a matter within the trial court's sound discretion and will not be reversed on appeal absent a manifest abuse of that discretion and a showing of prejudice to the defendant. *Solomon v. State*, 2010 Ark. App. 559, 379 S.W.3d 489. An abuse of discretion is a high threshold that does not simply require error in the trial court's decision but requires that the trial court acted improvidently, thoughtlessly, or without due consideration. *Harris v. State*, 2018 Ark. App. 219, 547 S.W.3d 709.

Arkansas Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*" (Emphasis added.) Therefore, evidence is not admissible under Rule 404(b) simply to show a prior bad act. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. Rather, the test for admissibility under Rule 404(b) is whether the evidence is *independently relevant*, which means it must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Id*. Any circumstance that links a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible under Rule 404(b). *Id*.

The analysis of whether evidence is admissible under Rule 404(b) is not resolved in a vacuum. While evidence of other crimes or bad acts may be independently relevant and therefore admissible under Rule 404(b), that evidence must also be probative and satisfy Rule 403. This court gives considerable leeway to the trial court to determine whether the circumstances of the prior crimes and the crimes at hand are sufficiently similar to warrant

16

admission under Rule 404(b). *See Vance*, *supra*; *Sasser v. State*, 321 Ark. 438, 902 S.W.2d 773 (1995); *Harris*, *supra*. When offered as Rule 404(b) evidence, the prior bad act need not have the degree of similarity that is required for evidence of modus operandi. *Fells v. State*, 362 Ark. 77, 207 S.W.3d 498 (2005). Our inquiry necessarily follows two questions. Is Ms. Wooten's testimony that appellant choked her during prior domestic disputes independently relevant to prove appellant's knowledge, intent, or absence of mistake? If that answer is no, the inquiry ends, and the evidence is not admissible under Rule 404(b). However, if that answer is yes, then the second question is whether the testimony is probative under Rule 403 and whether the probative value is substantially outweighed by the danger of unfair prejudice.

## A. Rule 404(b)

The first question then is whether Ms. Wooten's testimony that described appellant choking her during domestic disputes is *independently relevant* as evidence of appellant's *knowledge, intent, or absence of mistake*. The State argues that

> Wooten's testimony established that appellant was familiar with the force required to strangle a woman until she lost consciousness and with the seizure process that accompanied it. (R. 503-04, Ab. 110-11) Appellant's continuing to strangle Naomi beyond that point and to the point where the blood vessels in her head and eyes burst and she quit breathing, (R. 416-19, Ab. 81-82), demonstrated his intent to kill her, rather than just to make her unconscious for a moment. It also demonstrates that Naomi's death was not the result of a mistake or accident about the force or length of time required to strangle a person to death, but, rather, the result of appellant's knowledge of what it would take to strangle her to death and his premeditated and deliberated purpose to kill her. Given that appellant denied having killed Naomi, the State had to prove all elements of the crime to convict him.

This argument is apparently based on the forensic examiner's expert opinion on how much force and how long the force must be applied to kill a person. This argument presumes that

17

appellant has that same expert knowledge and that appellant's expert knowledge was solely acquired by appellant's previous choking of Ms. Wooten.

Appellant counters each of the State's arguments. Regarding knowledge, appellant argues that according to the forensic examiner, Dr. Craig, there is a vast difference between choking someone to the point of unconsciousness versus strangling someone to the point of death. Dr. Craig testified that the first takes only fifteen seconds whereas the latter takes one to two minutes with the person shaking and at least two episodes of the person bringing her arms up and shaking, then letting go. By Ms. Wooten's testimony, appellant previously choked her only to the point of unconsciousness for a second or two, which takes only fifteen seconds according to Dr. Craig. Therefore, appellant argues that Ms. Wooten's testimony does not show that he has any specialized knowledge of what he would experience or the force needed to actually strangle someone to death. We agree with appellant that the evidence in the record indicating that appellant choked Ms. Wooten into temporary unconsciousness a few years prior under the circumstances testified to by Ms. Wooten is not evidence of the knowledge as contemplated by Rule 404(b).

The State also argues that Ms. Wooten's testimony was independently relevant to prove appellant's intent and absence of mistake. Appellant argues that intent was *not* an issue given his general-denial defense. Appellant explains that his defense was that he was not the killer—not that he did *not intend* to kill. According to appellant, he argues that Ms. Wooten's "testimony was thus irrelevant to establish [his] intent in strangling Naomi because [he] did not contest that the killer intended to cause her death." Appellant further states that he did not claim that he only accidentally choked Naomi to death during a sexual

18

act or otherwise. Therefore, he argues that Ms. Wooten's testimony was "irrelevant to prove absence of mistake when [his] general-denial defense was absent any contention that [Naomi's] death was a mistake." We agree with appellant that Ms. Wooten's testimony was inadmissible under Rule 404(b) to show his intent or absence of mistake.

Our supreme court has explained that to be admissible under Rule 404(b) on the basis of intent, the sought prior criminal acts must require an intent similar to that required by the charged crime, although it is usually said that the prior crime need not closely resemble the charged crime. *Williams v. State*, 343 Ark. 591, 36 S.W.3d 324 (2001); *Sasser*, 321 Ark. 438, 902 S.W.2d 773. For example, a defendant's previous threats regarding a homicide victim are admissible to show intent and premeditation. *Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006). However, in *Phavixay*, our supreme court held that intent was not an issue, as it had been in other cases where evidence was allowed under the exception, and concluded that it could not perceive of any reason for the admission of Phavixay's prior drug transaction other than to show he was a drug dealer likely to have sold drugs again on the particular date for which he was tried. *Phavixay v. State*, 373 Ark. 168, 282 S.W.3d 795 (2008). Here, it is difficult to ascertain appellant's intent during the prior bad acts of choking Ms. Wooten since charges were not brought and a trial was not held. However, it appears from the record that appellant's prior bad acts occurred during domestic disputes and only after Ms. Wooten had initiated physical contact with appellant. Further, Ms. Wooten testified that she was unconscious for only a couple of seconds. Here, the State argued that appellant's intent was to strangle Naomi to death. We hold that

appellant's intent during the choking episodes with Ms. Wooten is not similar enough to show the same intent, nor does it closely resemble the intent to strangle Naomi.

According to Dr. Craig's testimony, the killer had to strangle Naomi for one or two minutes. Appellant's choking of another person for fifteen seconds years prior is not independently relevant to show his intent or absence of mistake unless appellant was making those arguments as his defense. *See Lewis v. State*, 2014 Ark. 23 (holding that a defendant accused of stabbing a victim to death was not permitted to introduce evidence of a State's witness's misdemeanor third-degree domestic-battery conviction for stabbing defendant as evidence of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident where the defendant had not developed at trial his theory that the State's witness was instead the actual perpetrator). Here, appellant simply claimed he wsa not the killer and did not claim that the strangulation was merely an accident that the State might need to rebut with Ms. Wooten's testimony. We agree with appellant that the evidence in the record indicating that appellant choked Ms. Wooten into temporary unconsciousness a few years prior under the circumstances testified to by Ms. Wooten is not evidence of the intent or absence of mistake as contemplated by Rule 404(b).

In conclusion on this point, the evidence in the record does not show that the testimony of Ms. Wooten was independently relevant to show intent, knowledge, or absence of mistake or accident, and we hold the trial court abused its discretion in admitting her testimony. The State's closing argument evinces the efficacy and conceivable influence of Ms. Wooten's admitted testimony:

> *Strangulation takes time. It takes a lot of energy. The medical examiner told you that it takes between one to two minutes before a person is deceased. The defendant has knowledge about*

20

*strangulation. You heard from Ms. Wooten. This is not the first time that he has strangled someone.*

(Emphasis added.) Overall, it is clear that the State used the testimony of Ms. Wooten to argue that because appellant had choked a previous girlfriend, he was acting in conformity with his prior bad acts and strangled Naomi. That is strictly prohibited under Rule 404(b). In *Williams*, we held that testimony regarding a prior incident in which the defendant's girlfriend claimed that the defendant had choked her was inadmissible under Rules 404(b) and 403 "because the evidence was introduced to show that he was a bad person, was irrelevant, and was unfairly prejudicial." *Williams v. State*, 2016 Ark. App. 507, at 5, 505 S.W.3d 234, 237.

## B. Rule 403

Next, even assuming Ms. Wooten's testimony did satisfy Rule 404(b), Arkansas Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Our supreme court has noted that evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree, otherwise it would not be offered. *Vance, supra*; *Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289. Nevertheless, the evidence should not be excluded under Rule 403 unless the defendant can show that the evidence lacks probative value in view of the risk of unfair prejudice. *Vance, supra*. This court reviews a trial court's ruling under Rule 403 for an abuse of discretion. *Id.* While the Rule 404(b) evidence here may have been prejudicial,

21

as most 404(b) evidence is, the question under Rule 403 is whether its probative value was substantially outweighed by the danger of unfair prejudice.

As in our analysis of independent relevance under Rule 404(b), we similarly hold that the testimony of Ms. Wooten has little or no probative value affecting the issues presented to the jury. Clearly, the danger of unfair prejudice is great here. The State's evidence at trial can best be described as circumstantial. Again, we turn to the excerpt quoted earlier from the State's closing argument to the jury:

> *Strangulation takes time. It takes a lot of energy. The medical examiner told you that it takes between one to two minutes before a person is deceased. The defendant has knowledge about strangulation. You heard from Ms. Wooten. This is not the first time that he has strangled someone.*

(Emphasis added.) The State's attempt to convince the jury that appellant must be guilty of strangulation based on the evidence that appellant previously choked his former girlfriend in an unrelated domestic dispute is the embodiment of the danger of unfair prejudice contemplated by Rule 403. Clearly, the probative value of Ms. Wooten's testimony was substantially outweighed by the danger of unfair prejudice. Thus, based on the record before us, we hold that Ms. Wooten's testimony should have also been excluded under Rule 403, and the trial court abused its discretion in failing to do so.

## C. Harmless Error

Finally, even though we hold that Ms. Wooten's testimony was inadmissible under Rule 404(b) and Rule 403, that does not conclude our inquiry. Even if a trial court errs in admitting evidence, when the evidence of guilt is overwhelming and the error is slight, we can declare that the error was harmless and affirm the conviction. *Williams v. State*, 2016 Ark. App. 507, 505 S.W.3d 234. Based on all the circumstantial evidence here, we cannot

22

conclude that the evidence is overwhelming as the State would have us do. Everything else merely relies on the credibility of the testimony of the Estrada family members and Naomi's friend regarding appellant's questionable stories and actions that might connect him to the murder. Even the DNA expert testified that she would expect to find appellant's DNA on Naomi's nail clippings due to their relationship. While the evidence is sufficient to support a conviction, this is hardly overwhelming evidence. Thus, we cannot affirm on the basis of harmless error.

### D. Additional Relevant Case Analysis

We acknowledge that *Stevenson v. State*, 2013 Ark. 100, 426 S.W.3d 416, at first blush, would seem to support the dissent's position. However, it is distinguishable. In *Stevenson*, the defendant was accused of murder. Stevenson admitted getting into a fight with the victim; however, his defense was that he did not have a knife and that someone else must have stabbed and killed the victim. Our supreme court held that evidence of two prior crimes involving Stevenson's use of a knife was admissible to show that "based on Stevenson's skill with a knife, the wounds were intentionally inflicted in the manner they were, and in the place they were, for the purpose of causing death." *Stevenson*, 2013 Ark. 100, at 12, 426 S.W.3d at 424. Dr. Erickson had testified the perpetrator was skilled with a knife based on how the wounds were inflicted. For example, one wound severed the victim's brachial artery and nerves in his arm, which rendered the victim's arm useless. Here, in this case, Dr. Craig did not provide any specific testimony that any specialized skill was used that appellant exemplified through Ms. Wooten's testimony. Ms. Wooten testified that appellant never used a belt during her experiences, that appellant choked her only until

23

she lost consciousness for a couple of seconds, and that these episodes were always preceded by domestic disputes that she initiated. Moreover, Dr. Craig could not tell whether a belt was even used, guessed that it was not, and did not testify that any specialized skill was used or needed in order to strangle Naomi. Thus, *Stevenson* is distinguishable from the facts of this case.

Instead, this case is more in line with *Williams*, *Lewis*, and our supreme court's holding in *Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006). Green was accused of murder. In an unrelated incident, a witness testified that her brother and nephew had stolen Green's marijuana plants and that she was afraid for her brother to be around Green because her nephew mysteriously died after the theft. Green objected and moved for a mistrial, but the trial court denied the objection and only offered to give an admonition to the jury that the statement was admissible only to show fear on behalf of the witness. Our supreme court held that the trial court had abused its discretion and remanded for a new trial. In doing so, our supreme court explained that the statement was not only prejudicial but also irrelevant to whether Green had committed the Elliott murders. It further held that it was nothing more than an attempt to prove that Green was a bad person and no admonition could cure its prejudicial effect. Similarly, our supreme court held that the trial court abused its discretion in allowing other testimony that Green was controlling and abusive, including the testimony of Green's daughter that Green had once held a gun to his wife's head and told her to "say her prayers." Again, our supreme court explained that the evidence that

Green was controlling and abusive was irrelevant and prejudicial.[2]  The same is true here. If we were to conclude that Ms. Wooten's testimony is admissible, we would be allowing the intent exception to swallow the rule and render Rule 404(b) meaningless.

In conclusion, we reverse and remand for a new trial that excludes the testimony of Mary Wooten.  Because we reverse and remand for a new trial excluding Ms. Wooten's testimony, it is unnecessary for us to address appellant's third argument on appeal regarding his motion for mistrial.

Reversed and remanded.

VIRDEN, GLADWIN, and MURPHY, JJ., agree.

ABRAMSON and BROWN, JJ., dissent.

**Raymond R. Abramson, Judge, dissenting**.  I respectfully dissent. The appellant's conviction should be affirmed. The circuit court did not abuse its discretion in admitting Ms. Wooten's testimony concerning appellant's prior acts of strangulation under Arkansas Rules of Evidence 404(b) and 403.

---

[2]Our supreme court recently distinguished *Green* in *Thompson v. State*, 2019 Ark. 290 586 S.W.3d 163.  Thompson was accused of two counts of first-degree murder, one count of attempted first-degree murder, and one count of aggravated residential burglary.  A witness spontaneously stated during questioning that Thompson was only "down here cause he had just broke his baby momma's leg."  *Thompson*, 2019 Ark. 290, at 3, 586 S.W.3d at 165.  After Thompson moved for a mistrial, the trial court denied the motion but instructed the jury to disregard the witness's statement as it was totally adlibbed and irrelevant to the issues in the case.  Our supreme court affirmed and explained that unlike *Green*, the witness's statement did not implicate Thompson in an unrelated crime.

However, *Thompson* is distinguishable from our facts.  Here, Ms. Wooten's testimony described in detail that appellant had choked her to the point of unconsciousness. Moreover, unlike *Thompson*, the jury was not instructed to disregard Ms. Wooten's testimony but was specifically told that they could consider her testimony as evidence of appellant's knowledge, intent, or absence of mistake.

As to Rule 404(b), Ms. Wooten's testimony is admissible to establish intent for the charged crime of capital murder. A person commits capital murder if, with the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person. Ark. Code Ann. § 5-10-101(4) (Supp. 2017). The question asked of the jury was whether appellant strangled Naomi with the premeditated and deliberated purpose of causing her death.[1] Premeditated and deliberated murder occurs when the killer's conscious object is to cause death, and he forms that intention before he acts and as a result of a weighing of the consequences of his course of conduct. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). From Ms. Wooten's testimony that appellant had previously strangled her to the point of unconsciousness, the jury could infer that appellant had intended to strangle Naomi with the premeditated and deliberated purpose to cause her death. Ark. R. Evid. 404(b) (*"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."*). In *Stevenson v. State*, 2013 Ark. 100, 426 S.W.3d 416, our supreme court held that for the charge of first-degree murder, the evidence of the defendant's prior crimes involving the use of a knife was admissible under Rule 404(b) to prove the defendant intentionally stabbed the victim with the purpose of causing his death. The majority claims that *Williams v. State*, 2016 Ark. App. 507, 505 S.W.3d 234, and *Green v. State*, 365 Ark. 478, 231 S.W.3d 638

---

[1]The jury obviously answered the question in the negative because it convicted appellant of the lesser-included offense of second-degree murder.

26

(2006), are controlling, but neither of those cases discuss the intent exception to Rule 404(b).

The majority finds that the choking episodes with Ms. Wooten are not similar enough to Naomi's strangulation to show intent. I disagree. The incidents occurred within two years of each other against appellant's female companions in nonsexual attacks. I recognize the obvious distinction—that appellant did not strangle Ms. Wooten to death. However, that distinction is relevant to premeditated and deliberated purpose: whether it was appellant's conscious objective to cause Naomi's death and whether he formed that intention before he acted and as a result of weighing the consequences of his course of conduct.

The majority asserts that because appellant asserted a general-denial defense, intent was not an issue at trial. Respectfully, the majority misstates the law. The State has the burden to prove all the essential elements of the charged crime beyond a reasonable doubt. *See Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003). Thus, the State had to prove premeditated and deliberated purpose regardless of appellant's defense.

The majority incorrectly relies on *Lewis v. State*, 2014 Ark. 23, for the proposition that a prior bad act is not independently relevant to show intent unless the defendant makes intent an issue at trial. But unlike here, the issue in *Lewis* was whether *the defendant* could cross-examine a witness about a prior bad act. *Id.* The supreme court held that the witness's prior bad acts were inadmissible under Rule 404(b) because the defendant did not develop the defense at trial that the witness was the perpetrator of the murder. *Id.* Thus, *Lewis* does

27

not stand for the proposition that the State's burden of proof is alleviated if the defendant does not contest the issue of prior bad acts at trial.

Moreover, there was evidence that refuted the State's theory of capital murder. Naomi was found nude, and when confronted about Naomi's whereabouts, appellant mentioned sex. Ms. Wooten's testimony is independently relevant to establish that appellant acted with a premeditated and deliberated purpose despite the evidence suggesting a sexual act. Remember, the coroner found no evidence of sexual activity.

The majority further claims that the prosecutor's statement made in closing arguments evinces the true reason for the introduction of Ms. Wooten's testimony. But the court admitted Ms. Wooten's testimony well *before* the closing arguments. Specifically, the court admitted the testimony at the hearing on Gonzales's motion in limine before trial. The court could not have foreseen at that time what the prosecutor might argue in closing. Thus, the majority's reliance on the closing argument is misplaced when considering the circuit court's evidentiary decision. This court should not conclude that the circuit court abused its discretion in admitting the testimony on the basis of the prosecutor's statements, which were made well after it was admitted. Moreover, the appellant moved for a mistrial as a result of the prosecutor's closing arguments, and he appeals the circuit court's denial of that motion. Our review of the prosecutor's remarks should be considered when analyzing that point on appeal. I believe the majority has conflated these separate issues.

I would also hold that the circuit court did not abuse its discretion in admitting the evidence under Arkansas Rule of Evidence 403. While Ms. Wooten's testimony may have been prejudicial, as is most Rule 404(b) evidence, it was also independently relevant to

28

establish appellant's intent for the charge of capital murder, and its probative value was not outweighed by the danger of unfair prejudice. *See Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325 (stating that most Rule 404(b) evidence is prejudicial). Our supreme court has long held that it is proper to allow the State to prove its case as fully as possible. *See Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006). Further, the court gave the jury a cautionary instruction that Ms. Wooten's testimony could not be considered to show that appellant acted in conformity with his prior acts, which limited its prejudicial impact. This court affords great deference to a circuit court's ruling on relevancy and prejudicial impact.

Accordingly, because the circuit court did not abuse its discretion in admitting Ms. Wooten's testimony pursuant to Rules 404(b) and 403, I would affirm appellant's conviction of second–degree murder.

BROWN, J., joins.

*James Law Firm*, by: *Michael Kiel Kaiser* and *Bobby R. Digby II*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.